UNITED STATES, Appellee

v.

Josiah GREAVES, Jr., Sergeant
U.S. Air Force, Appellant.

Nos. 93–0203.
CMR No. 29113.

U.S. Court of Military Appeals.

Argued March 1, 1994.

Decided Sept. 22, 1994.

For Appellant: *Lieutenant Colonel Frank J. Spinner* (argued): *Colonel Jay L. Cohen* (on brief); *Colonel Terry J. Woodhouse* and *Captain Gilbert J. Andria, Jr.*

For Appellee: *Major Barnard N. Madsen* (argued); *Colonel Jeffery T. Infelise* (on brief).

## Opinion of the Court

COX, Judge:

 This is another in the steady stream of sexual misconduct cases to come before this Court. Contrary to his pleas, appellant was convicted (with exceptions) of indecent assault on O, a female petty officer, United States Navy, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934.[1] At his court-martial, appellant did not dispute that he touched, fondled, and otherwise violated the victim, as alleged; nor did he contend that Petty Officer O actually consented to the conduct. Rather, his defense was that, under the circumstances then and there prevailing, he *reasonably and honestly*—albeit mistakenly—thought she was consenting. Consent, of course, can convert what might otherwise be offensive touching into nonoffensive touching—*United States v. Joseph*, 37 MJ 392, 396 n. 5 (CMA 1993); and a reasonable and honest mistake of fact as to consent constitutes an affirmative defense in the nature of legal excuse.[2] RCM 916(j), Manual for Courts–Martial, United States, 1984; *United States v. Baran*, 22 MJ 265, 267 (CMA 1986); *United States v. Carr*, 18 MJ 297, 301 (CMA 1984).

By his own testimony, appellant plainly raised the defense theory of mistake of fact; and the military judge duly gave such an instruction at the close of the case. Appellant's complaint, both at trial and on appeal, is that he was prejudicially denied the right to introduce certain additional testimony in support of his theory. We granted review of this issue, as framed by appellant:

WHETHER APPELLANT WAS DE-NIED THE CONSTITUTIONAL RIGHT TO FULLY PRESENT A DEFENSE WHEN THE MILITARY JUDGE RULED, UNDER MIL.R. EVID. 412, THAT APPELLANT COULD NOT TES-TIFY, IN SUPPORT OF HIS MISTAKE OF FACT DEFENSE, REGARDING THE ALLEGED VICTIM'S EMPLOY-MENT AS A JAPANESE CLUB HOST-ESS WHO PROVIDED MALE PA-TRONS "FEMALE COMPANIONSHIP," A EUPHEMISM FOR SEX.

## Background Facts

On January 14, 1990, while appellant's wife and daughter were in the Philippines, appellant threw a party at his quarters on Camp Kinser, Marine Corps Base, Japan. His guests included Petty Officer O, Airman First Class Megan Nimmo, Sergeant Jim Entwistle, and Airman Jennifer Smith. Early in the morning of January 15, at about 2:30 or 3:00 a.m., Petty Officer O, Airman Nimmo, Sergeant Entwistle, and appellant went into appellant's bedroom to play a computer game. After playing the computer game for about 20 minutes, Airman Nimmo left appellant's room and went to sleep in the other bedroom in appellant's house. At that time, only appellant, O, Nimmo, and Entwistle remained at the party. While watching Entwistle play the computer games, O fell asleep, fully clothed, on top of the covers on one end of appellant's bed. Appellant, also fully clothed, apparently fell asleep on top of the covers on the other side of the bed.

Petty Officer O testified that the last thing she remembered before drifting off to sleep was watching the computer games. The next thing she remembered was:

having a dream and realizing that it was very strange. It was ... something was wrong.

Q. What was wrong?

A. It just felt like it shouldn't be happening. It was like a discolored dream. It was bad.

Q. Can you be a little bit more specific what the dream was about?

---

1. On September 5–7 and 10, 1990, appellant was tried by general court-martial at Kadena Air Base, Japan. He was sentenced to a bad-conduct discharge, confinement for 60 days, and reduction to the lowest enlisted grade. The convening authority approved the sentence, and the

Court of Military Review affirmed in an unpublished opinion.

2. "Honest" and "mistake" are redundant. One is either mistaken or not.

A. That somebody was performing fore-play with their fingers and their mouth in the vaginal area and around the buttocks.

Q. What is the next thing that you remember?

A. I remember waking up and I felt somebody shove away from me quickly.

Q. Where did you feel that shove?

A. On my buttocks area. Then I felt the covers being pulled from underneath me quickly. And as I turned to my left, I saw Sergeant Greaves pulling the covers up over his chest, which was—his chest was bare. His shoulders were bare.

Q. How was that movement of pulling the covers over himself? What was that like?

A. He was moving away from me backwards and pulling the covers with him. So it was pulling the covers from under me as I turned to look.

Upon waking, O also discovered that her "skirt was up and twisted around ... [her] hips"; her "pantyhose were no longer on ... [her] legs. There was a wetness between ... [her] legs" which "was like a slimy feeling between ... [her] legs." Realizing generally what was happening, she quickly jumped up and bolted from the room, repeating, "That's f---ed up." According to O's testimony, appellant "was still in the room, somewhere behind me. He was saying 'Wait' or 'Stop, let me talk to you,' or something like that. But I just ... (the witness was crying)."

Sergeant Entwistle testified that, after he had finished playing the computer game, he tried unsuccessfully to rouse O from her sleep. Entwistle drove O to the party and was to take her home. According to his testimony, Entwistle

shook her on the shoulder hard enough to wake her up but not hard enough to hurt her. And she mumbled "What?" And I left it as that she was tired. I figured that she maybe needed to sleep a little bit longer....

\* \* \*

[Her eyes] were kind of squinted from the light....

It was about 4:15 a.m.

Unable to rouse her, Entwistle left the room for 15 or 20 minutes and began to straightened up the apartment from the party. The lights in the bedroom were left on, and the door was open. When he returned to the room, the parties were in the same positions as before. Again, Entwistle tried to rouse O "by shaking her." Again, "[s]he just moaned," and her eyes were "[s]till closed." Entwistle "went back out into the living room, sat down in the recliner, and dozed off."

The next thing Entwistle knew, O came streaming out of the room, shouting, "That's f---ed up. That's f---ed up." She appeared "upset, scared." Her clothes were disheveled. Appellant "came out right behind her.... [I]t looked like he was fastening his pants. He had no shirt on, no socks." Appellant "looked at ... [Entwistle] and he [appellant] went, 'I f---ed up.'"

Entwistle and O quickly rounded up their possessions and left. It was about 5:30 a.m. According to Entwistle, O cried all the way home.

Appellant testified to quite a different perception of the events. He corroborated falling asleep at the end of the bed opposite where Petty Officer O had been sitting. When he later awoke, only he and O were in the room, and O was asleep on top of the bed fully clothed. From these facts, appellant claims to have deduced that Entwistle had gone home, leaving O to spend the night, and that O was in his bed for a reason. Appellant testified that O's leg was next to his face and that he could see up her skirt. Not knowing whether she was awake or asleep, he touched her leg, and she started to moan. According to his testimony, he asked her if she wanted "to fool around," and he took her moans to be a positive response. With O's assistance, according to appellant, he lifted her miniskirt, removed her panty hose, and began to fondle her ("[s]he was flat on her stomach"). Appellant testified that O facilitated the "foreplay" by "moving around a little bit to kind of like assist me in finding

the spot, you know, that most pleases her." By her conduct and affirmative responses, appellant was "absolutely convinced" she was consenting.

Thus encouraged, he then got out of bed to remove his clothes. When he returned, he touched her buttocks, and

> she just ... like her head snapped around and looked at me in total disarray. .... [F]rom the look on her face when she snapped up and turned around and looked at me, there was something definitely wrong. I mean, there was no longer any indication to me that she is going along with this at that time.

Appellant "went into a complete panic," claiming not to "understand what was going on." He tried to talk with O, but she rebuffed him and "stormed out of the room."

After Entwistle and O had left the house, appellant woke up Nimmo, who was still asleep in the other room, and related his version of the events to her. According to Nimmo, appellant made no pretense about being mistaken in thinking that O was actually his wife. However over the next days and weeks, as he admitted at trial, he falsely told several other people that, as he awakened from his sleep, he thought he was in bed with his wife.

Sometime after the incident, appellant approached Nimmo. As she testified:

> He said that Petty Officer ... [O] had pressed charges and that his First Sergeant was probably going to contact me so that I could make a statement.
>
> * * *
>
> He asked me if I recalled him saying that he thought Petty Officer ... [O] was his wife. I said no.
>
> The next time Nimmo ran into appellant: [H]e said that my statement would probably put him away.
>
> * * *

He asked—he said, "I thought ..." You know ... "Didn't you remember that I thought she was my wife,"—Petty Officer ... [O]. I said, "No, you never said that."

At the court-martial, appellant conceded that he was fully aware it was O at the other end of the bed. As he testified:

> I made a decision that was really screwed up and messed up.... I thought it would be okay for me to have sex with someone who wasn't my wife in my own house....

He denied that his prevaricating about his knowledge of the victim's identity was an attempt to establish a defense. He contended that it was merely an attempt to mollify his wife and save his marriage.

Nimmo also testified that appellant gave this explanation to her why she, O, and Airman Smith were invited to the party:

> A. He said—he told me later that we were—Petty Officer ... [O], Airman Smith, and I were his favorite females from the club.[3] That he liked us all three, and he figured that, considering it was a drinking party, something was bound to happen.
>
> Q. What did you take that to mean?
>
> A. Sexual.[4]

Based on a question posed by a court member, appellant acknowledged that Petty Officer O had given him no indication earlier that night that she was interested in receiving his advances.

### The Excluded Evidence

In support of his theory of reasonable mistake of fact as to consent, appellant wanted to introduce some additional evidence about Petty Officer O's background. In appellant's view, this evidence made his mistake as to her consent all the more reasonable. Appellant wanted to testify that O had told him that, until recently, she had been working after duty hours "at the New Rose and being a hostess and entertaining married Japanese

---

3. In his off-duty time, appellant moonlighted as a bartender at the Airman's Club, Kadena AB, Japan.

4. Appellant also had made a particular point of inviting everyone, including the women, to spend the night at his house. He explained this as a mere manifestation of his solicitude for their well-being, not wishing them to drive while intoxicated.

men at the bar." Appellant also wanted to testify that he understood, based on what O told him, that "she was the only person that was an American in that bar." Further, appellant wanted to testify that O reported earning "a good amount of money" working at the bar.

This information, coupled with the way appellant said she dressed for work at the New Rose—

[S]he was dressed to kill; lots of make-up....

\* \* \*

[S]he is not hiding herself. She is exposing as much of her body as possible. She is wearing see-through shirts with very lacy type of bras and stuff like that, that when you are in the right light, you can see through the shirt and see the bra and things like this ...[—]

suggested to appellant that "she was ... you know, doing, you know, in my mind she was free and easy and willing to do almost anything, with married or single people." Her alleged part-time employment led appellant to presume "that she was going to be more likely than not to give in to ... [his] advances."

Appellant conceded, however, that his knowledge about the New Rose was very slim indeed. As he testified: "[T]he bar that she worked at, the New Rose, catered to married Japanese—rich married Japanese personnel. It was a Japanese bar only...." Obviously, neither appellant or any of his friends had ever been to the New Rose. Indeed, apart from his fertile imagination, appellant admitted that he knew nothing at all about what went on at the New Rose and nothing at all about the victim's sexual history or inclinations.

Nonetheless, the defense argued that it was important to appellant's defense of reasonable and honest mistake of fact that he be able to testify that the victim worked at that bar and what that suggested to him.

The Government, on the other hand, contended that such testimony was barred by Mil.R.Evid 412, Manual, *supra* (the "rape-shield" rule), *see infra*, and it moved *in limine* for the court to preclude the defense from attempting to introduce any "evidence" of Petty Officer O's "past sexual activity, including her employment at a bar off base."

### The Ruling

The military judge made the following ruling:

[I]t appears to the court that the issue is as Trial Counsel indicates, whether the victim was consenting at the time.... Any mistake of fact might well go to her actions at the time, based upon the information presented to the court and before it right now, any mistake at that time as to the signals she was giving. But based upon what the court has heard, the issue is not what was known about the victim prior to this time. It was: what were her actions at the specific point in time of the advances being made by Sergeant Greaves? And, on that basis, the court does not feel that mistake of fact based upon her prior employment as a hostess, and the fact that the Accused assumed that she would be loose and therefore he was mistaken, that that would be reasonably in issue, at least at this point in time.... The court does not find that this information would be constitutionally required to be presented. And, therefore, accordingly, M.R.E. [Mil.R.Evid.] 412 would prevent incursion into this area. Because, as I indicated and as Defense now concedes, where she worked is indeed specifically connected to sex [sic]. Everything about this comes down, in essence, to the insinuation being what the court raised in the first place, and that is that a female who works at a Japanese nightclub as a hostess is a euphemism for either a higher class prostitute or for a woman who is extremely loose and easy. That type of inquiry, whether it be from the Accused himself or being brought out by others concerning Petty Officer ... [O] is specifically what is forbidden by MRE 412.

He additionally found:

There was no evidence to show any kind of any flirting or any other affirmative actions by Petty Officer ... [O] that would

show willingness on her part to consent to sexual intercourse with the Accused. The Accused did not know what her job as a hostess actually entailed. He didn't know whether or not she even left the New Rose with Japanese gentlemen. He knew only that she worked there as the only American hostess and he assumed that she had intercourse with patrons. At the time of the offense, she was no longer working at the club. The Accused was aware that she was no longer working at the club. The club she was working at, the New Rose, was an all Japanese club. Based upon what was presented, no Americans frequented that club. So the people she came in contact with, even if what the Accused assumed was true as to what she was doing, they were Japanese businessmen, essentially. Whereas the Accused is an American Caucasian.

The circumstances of the encounter with Petty Officer . . . [O] were in no way similar to her prior employment. They did not, for instance, meet at the New Rose Club or at any other club and then go off somewhere together.

She wasn't invited to his house alone[;] it was a party that the Accused and Sergeant Bridges planned and she was specifically invited with others.

She was lying at the opposite end of the bed. She was dressed. She was not under the covers. She had not cuddled with the Accused in any way. There was no showing of affection in any way with the Accused.

Based on Mil.R.Evid. 412, the military judge granted the Government's motion *in limine.*

### Analysis

With certain exceptions not here pertinent, Mil.R.Evid. 412 provides:

(a) Notwithstanding any other provision of these rules or this Manual, in a case in which a person is accused of a nonconsensual sexual offense, *reputation or opinion evidence of the past sexual behavior of an alleged victim of such nonconsensual sexual offense is not admissible.*

(b) Notwithstanding any other provision of these rules or this Manual, in a case in which a person is accused of a nonconsensual sexual offense, *evidence of a victim's past sexual behavior other than reputation or opinion evidence is also not admissible.*

(Emphasis added.)

Arguably, appellant's testimony did not even fall within the literal language of Mil. R.Evid. 412—since all he claimed to know for a fact was that O worked at a Japanese bar, dressed provocatively, and made good money. Nevertheless, it is clear that appellant wanted the court members to project, along with him, that O was in fact a prostitute or at least an extremely "loose" woman.

■■■ Before deciding whether Mil. R.Evid. 412 barred anything, however, it is useful to determine whether the evidence in question met even the threshold requirement of relevance. As defined by Mil.R.Evid. 401:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Irrelevant evidence is not admissible. Mil. R.Evid. 402. Obviously, appellant's projected beliefs about O's sexual relations, if any, with persons unknown to him had no bearing whatever on whether O was actually consenting to him on the night in question.

■■ The trial question was—would a *reasonable* person in appellant's position (*i.e.,* knowing what appellant "knew") have made the mistake of believing that O was actually consenting *then?*[5] The evidentiary counter-

---

**5.** It would seem that one is not being reasonable if one is being reckless or negligent. Thus it would seem that for one reasonably to believe something, one must have taken such measures as to not be reckless or negligent with respect to the truth of the matter. In other words, one

must be seen as exercising due care with respect to the truth of the matter in issue.

An arguably better conceptual model recognizes that, in most cases, each element of each offense contains its own *mens rea* component, often implicitly; and mistake of fact is seen not as a common law "affirmative defense," but

part was—did what appellant claim to know about O make it more reasonable for him to conclude, albeit mistakenly, that she was actually consenting to him at the time in question? The only answer here, in our view, is no. That she may have worked at a Japanese bar, dressed provocatively, and made good money in no way would add to the perception of a reasonable person in appellant's position that she was awake and consenting *to his advances.*

On the question whether a reasonable person would have believed that Petty Officer O was awake and capable of consent, her sexual history is clearly irrelevant. On the question whether appellant reasonably believed she was manifesting consent, the relevance of appellant's proffered evidence about her sexual history must be analyzed from two aspects: (1) Would a reasonable person believe, based on the quality and quantity of appellant's knowledge about O's past, that she was so indiscriminately promiscuous that she would consent to sex with him under the circumstances he described?; and (2) Assuming *arguendo* that a reasonable person could conclude, based on the information available to appellant, that she was indiscriminately promiscuous, could a reasonable person then conclude that her moaning meant "yes"? We need not reach the second question, because we conclude, based on appellant's meager proffer, that a rational factfinder could not conclude much of anything about O's sexual practices. Thus we conclude that the prof-

fered evidence did not even meet the threshold of relevance in Mil.R.Evid. 401 and 402.[6] We do not decide on this record that evidence of a prosecutrix's sexual relations with others could *never* be probative of the reasonableness or actuality of an accused's mistake.

■ The military judge's Mil.R.Evid 412 analysis incorporated the four-part test articulated in *United States v. Dorsey,* 16 MJ 1 (CMA 1983). *Cf. United States v. Williams,* 37 MJ 352, 362 (CMA 1993) (Cox and Crawford, JJ., disagreeing with application of the *Dorsey* test). The judge determined that evidence of O's alleged previous employment at the New Rose was not relevant or material and that, although as·viewed by appellant it might appear favorable to the defense, its potential for prejudice outweighed its probative value in any event. We agree.

■ We have said:

When the defense seeks to present evidence which is subject to the exclusionary provision of Mil.R.Evid. 412, it must clearly demonstrate that the proffered evidence is relevant, material, and favorable to its case. *United States v. Elvine,* 16 MJ 14 (CMA 1983); *United States v. Dorsey,* [16 MJ 1 (CMA 1983)]. Furthermore, the "probative value of" the evidence must outweigh "the danger of unfair prejudice." Mil.R.Evid. 412(c)(3).

*United States v. Fox,* 24 MJ 110, 112 (CMA 1987).[7] *See also United States v. Hicks,* 24

---

merely as an attack on the *mens rea* component of the particular element. *See* §§ 2.02 and 2.04, ALI Model Penal Code, *reprinted in Model Penal Code and Commentaries* (Part I) 225 and 267 (1985); W. LaFave and A. Scott, *Substantive Criminal Law* § 3.4 at 296 (1986).

6. *Doe v. United States,* 666 F.2d 43 (4th Cir. 1981), addresses admissibility of evidence of reputation or opinion or of past sexual acts, not to show that the alleged victim consented, but to support the defendant's defense of mistake of fact as to her consent. In *Doe,* the Fourth Circuit affirmed the "district court's evidentiary ruling ... pursuant to rule 412 of the Federal Rules of Evidence [holding] ... that evidence concerning past sexual behavior and habits of the prosecutrix was admissible in [a] rape trial." 666 F.2d at 45. The court stated that there was no indication in Rule 412 that evidence targeted by the rule should be excluded on the issue of the accused's state of mind. 666 F.2d at 48.

However, the Fourth Circuit has since retreated somewhat from that position. In *United States v. Saunders,* 943 F.2d 388 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992), Saunders was allowed to testify as to his own sexual experiences with the victim, but any evidence that others had exchanged drugs for sex with the victim was held inadmissible under Fed.R.Evid. 412. Without expressly deciding the correctness of *Doe,* but noting that it has been criticized, the Fourth Circuit upheld the district court's ruling. 943 F.2d at 391.

7. Before Fed.R.Evid. 412 was enacted, *United States v. Kasto,* 584 F.2d 268 (8th Cir.1978), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979), was the leading case on reputation and opinion evidence of a victim's past sexual behavior in determining consent. In that case, the Eighth Circuit held that

MJ 3, 10 (CMA 1987), *cert. denied,* 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 55 (1987); *United States v. Holliman,* 16 MJ 164, 165 (CMA 1983)("Whatever type of evidence may be offered as to past sexual behavior of an alleged victim, the underlying analysis is the same; and, as we have made clear in other cases, it centers on the relevance, materiality, and favorability to the defense of such evidence"), *citing United States v. Dorsey, supra; United States v. Elvine,* 16 MJ 14 (CMA 1983). Mil.R.Evid. 412 is primarily a rule of relevance, and in our view, the defense has failed to demonstrate relevance of the evidence it sought to introduce. *United States v. Fox,* 24 MJ at 112. *See United States v. Colon–Angueira,* 16 MJ 20, 29 (CMA 1983) (Everett, C.J., concurring).[8]

■ Additionally, appellant's claim that the excluded evidence was constitutionally required is without merit. "Rule 412 was premised on the precept that an accused does not have a constitutional right to present irrelevant evidence, and 'reputation and opinion concerning a victim's past sexual behavior are not relevant indicators of the likelihood of her consent to a specific sexual act or of her veracity.' " *United States v. Duncan,* 855 F.2d 1528, 1533 (11th Cir.1988) (addressing issue of whether victim's chastity is admissible under Rule 412), *citing Doe v. United States,* 666 F.2d 43, 47 (4th Cir.1981), *cert. denied in Duncan,* 489 U.S. 1029, 109 S.Ct. 1161, 103 L.Ed.2d 220 (1989). "The exclusion of irrelevant evidence does not implicate constitutional concerns." *Allen v. Morris,* 845 F.2d 610, 614–15 (6th Cir.1988), *citing United States v. Kasto,* 584 F.2d 268, 272 (8th Cir.1978), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979), *cert. denied in Allen,* 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989).

Appellant was not denied his mistake-of-fact defense, but was allowed to present evidence of the circumstances surrounding the events of the night. The members obviously did not buy appellant's defense. Evidence of the prosecutrix's previous employment as a hostess at a Japanese bar added nothing legitimate to the defense. *See Olden v. Kentucky,* 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988). The military judge properly excluded this irrelevant evidence. *See United States v. Travers,* 25 MJ 61, 62–63 (CMA 1987).

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges CRAWFORD, GIERKE, and WISS concur.

---

evidence of a rape victim's unchastity, whether in the form of testimony concerning her general reputation or direct or cross-examination testimony concerning specific acts with persons other than the defendant, is ordinarily insufficiently probative either of her general credibility as a witness or of her consent to intercourse with the defendant on the particular occasion charged to outweigh its highly prejudicial effect. . . .
584 F.2d at 271–72 (footnote and citations omitted). Both Fed.R.Evid. 412 and Mil.R.Evid. 412, Manual for Courts–Martial, United States, 1984, embody this rationale.

8. *See also United States v. Pickens,* 17 MJ 391, 392 (CMA 1984) (victim's prior intercourse and flirtations with persons other than accused inadmissible); *Wood v. State of Alaska,* 957 F.2d 1544 (9th Cir.1992) (fact that victim posed in "Penthouse" irrelevant to whether she would have sex with accused); *Jeffries v. Nix,* 912 F.2d 982 (8th Cir.1990) (evidence that woman exchanged sex for money in past not admissible under Iowa rape-shield statute, because there was no evidence she offered to make such exchange here), *cert. denied,* 499 U.S. 927, 111 S.Ct. 1327, 113 L.Ed.2d 259 (1991); *United States v. Duran,* 886 F.2d 167, 168 n. 3 (8th Cir.1989) ("Reputation or opinion evidence of past sexual behavior is totally precluded under Rule 412(a)."); *Eastwood v. Dept. of Corrections of State of Oklahoma,* 846 F.2d 627, 631 (10th Cir.1988) ("Indications of a victim's promiscuity are not probative of either credibility or consent to sexual advances.").