# United States Navy–Marine Corps Court of Criminal Appeals

Before
MONAHAN, STEPHENS, and DEERWESTER
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Thomas E. MADER III**
Sergeant (E-5), U.S. Marine Corps
*Appellant*

**No. 201800276 (f rev)**

_____

Decided: 19 May 2022

Appeal from the United States Navy-Marine Corps Trial Judiciary
*upon further review following remand from
the United States Court of Appeals for the Armed Forces*

Military Judge:
Leon J. Francis

Sentence adjudged 4 May 2018 by a general court-martial convened at Marine Corps Base Hawaii, Kaneohe Bay, Hawaii, consisting of members with enlisted representation. Sentence approved by the convening authority: reduction to E-1, confinement for 190 days, forfeiture of all pay and allowances, and a bad-conduct discharge.

For Appellant:
*Major Mary Claire Finnen, USMC*

For Appellee:
*Lieutenant Commander Jeffrey S. Marden, JAGC, USN*
*Major Kerry E. Friedewald, USMC*

Senior Judge STEPHENS delivered the Opinion of the Court, in which
Chief Judge MONAHAN and Judge DEERWESTER joined.

———————————————

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

———————————————

STEPHENS, Senior Judge:

This case involves hazing and assault committed against junior Marines.
It is now before us a second time. In 2020, we found the evidence for one of
Appellant's specifications for hazing to be factually insufficient and set it aside
and dismissed it with prejudice. But we affirmed a conviction for hazing for
Appellant calling a junior Marine a derogatory racial name along with affirm-
ing the remaining four specifications of assault consummated by battery for
punching the same junior Marine in the stomach and for burning three other
junior Marines with a cigarette. We affirmed the burning specifications owing
to our belief that the junior Marines could not have legally consented to such
an action.[1] In 2021, the Court of Appeals for the Armed Forces [CAAF] affirmed
our decision with respect to one of Appellant's hazing specifications and for one
of his assault specifications for punching a junior Marine in the stomach. But
CAAF reversed our opinion concerning whether the junior Marines could law-
fully consent to being burned with cigarettes and remanded the case.[2]

Appellant asserts two Assignments of Error [AOE]: that (1) the specifica-
tions for burning the junior Marines with cigarettes were legally and factually
insufficient because Appellant believed they consented and it was reasonable
under the circumstances to have such a belief; and (2) Appellant's use of a de-

———————————————

[1] *See United States v. Mader*, 79 M..J. 803 (N-M. Ct. Crim. App. 2020) [*Mader I*].

[2] *See United States v. Mader*, 81 M.J. 105 (C.A.A.F. 2021) [*Mader II*].

rogatory racial name toward one of the junior Marines was legally and factually insufficient because the junior Marine did not feel abused, humiliated, oppressed, or demeaned.[3]

We now find the evidence for Appellant's findings for burning the junior Marines with cigarettes to be factually insufficient and we set aside and dismiss those specifications.

This leaves Appellant with findings of guilt—previously affirmed by CAAF—for a single specification of hazing in violation of Article 92, Uniform Code of Military Justice [UCMJ],[4] by calling a junior Marine a derogatory name and a single specification of assault consummated by battery in violation of Article 128, UCMJ, for punching that same junior Marine in the stomach. We reassess the sentence and take action in our decretal paragraph.

## I. BACKGROUND[5]

### A. Saturday Evening at the Barracks

Appellant was a data Marine in the communications platoon of Third Battalion, Third Marine Regiment [3/3] at Marine Corps Base [MCB] Hawaii, Kaneohe Bay, Hawaii. He had been at 3/3 for about three years and was days away from executing permanent change of station orders to recruiting duty in the continental United States. On the Saturday before he left, Appellant went to one of the barracks where some of the 3/3 data Marines lived. The day before, most of them had returned to MCB Hawaii from a lengthy, large-scale training exercise on the big island of Hawaii at the Pohakuloa Training Area [PTA].

Appellant went to see Sergeant (E-5) [Sgt] Alpha[6] from the data section, who lived on the third deck of this particular barracks. Private First Class (E-2) [PFC] Bravo and PFC Charlie were roommates on the second deck. Lance Corporal (E-3) [LCpl] Delta and LCpl Echo were also outside the barracks at a smoke pit. Except for LCpl Delta, these 3/3 data Marines had just returned from PTA. The data section had its "ups and downs" at the exercise, and some

---

[3] The second AOE is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We have reviewed this AOE and find no error. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

[4] 10 U.S.C. § 892.

[5] We reproduced the "Background" section from *Mader I* nearly verbatim.

[6] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

Marines had been relieved for poor performance.[7] That night, the mood shifted between drinking and having fun and more serious conversations about morale and life in the Marine Corps. Appellant had a bottle of whiskey with him. He drank that mixed with soda. Sergeant Alpha was also drinking, as was PFC Bravo, who eventually became drunk.

When Appellant was on the third deck talking and drinking with Sgt Alpha, he decided to go down to the second deck to PFC Charlie and PFC Bravo's room. Seeing LCpls Delta and Echo down in the smoke pit, Appellant called down to them. When Appellant got to PFC Charlie's room, he walked up to him, made a "knife hand," traced it down his chest, and punched him in the stomach. Appellant then called PFC Charlie, who is Puerto-Rican, a "beaner version of his [Appellant's] cousin."[8] Lance Corporals Delta and Echo witnessed this interaction.

A few minutes afterwards, the group ended up on the catwalk outside of Sgt Alpha's room. Most of them went inside, but Appellant and PFC Bravo stayed outside. Appellant handed PFC Bravo the bottle of whiskey and said, "Here, take a swig"[9] or "take a shot."[10] Private First Class Bravo took the bottle and started drinking very quickly, causing Appellant to tell him to "calm down" and try to pull the bottle away.[11] That junior Marine continued to drink that night, including sharing a glass of whiskey and soda with Appellant.

At some point, the conversation turned to Appellant and another sergeant's plans the next day to hike up Kansas Tower Hill [KT] on MCB Hawaii. Appellant said he noticed PFC Bravo appeared to be in better shape and called him a "savage,"[12] and asked if he wanted to join the KT hike. Appellant then jabbed him a few times in the stomach and pressed his head forcefully up against his. Appellant also asked if PFC Bravo wanted to go to the gym with him the next day, which, according to Appellant, he expressed interest in doing.

Sometime afterwards, Appellant was with PFC Bravo and LCpls Delta and Echo on the catwalk outside Sgt Alpha's room. Private First Class Charlie was inside Sgt Alpha's room with the door closed. The conversation turned to the

---

[7] R. at 590.

[8] R. at 372, 513, 564. The record indicated the word "beaner" is a derogatory epithet referring to persons of Mexican or Hispanic descent.

[9] R. at 408.

[10] R. at 761.

[11] R. at 762.

[12] R. at 764.

problems with the PTA exercise and morale in the communications platoon. Appellant brought up that he and others were "burned" with a cigarette when he joined the platoon as a way of bonding. With this, Appellant took his cigarette and burned the chest of both PFC Bravo and LCpl Echo and LCpl Delta's shoulder. None of the junior Marines manifested any physical or verbal signs of lack of consent. The socializing continued for some time into the evening without incident.

The following morning, Appellant exchanged text messages with PFC Bravo about going to the gym. Due to his hangover, he declined, but Appellant still came to his room. He brought the junior Marine a dress cover that did not fit him. Appellant also stopped by LCpl Echo's room to inspect the cigarette burn. When Appellant asked LCpl Echo about his burn, he responded, "I wouldn't worry about it."[13] None of the junior Marines reported the incident. Two days later, Appellant left Hawaii. When one of the platoon's other lance corporals found out about the incident, he reported it, prompting a criminal investigation.

Appellant was in the process of executing his PCS orders to his next duty station. He and his wife, who was pregnant with their first child, were in Pennsylvania. Appellant's Orders were changed and he was recalled. Without any explanation from either his new or his old command, he returned to Hawaii. After being back at 3/3 for just over three weeks, his command placed him in pretrial confinement. Ten days later, the Government preferred charges against him. Ten days after that, he waived his right to a preliminary hearing under Article 32, UCMJ.

## B. Appellant's General Court-Martial

After nearly six months in pretrial confinement, the contested phase of Appellant's court-martial commenced. His members' trial lasted four days. The Government presented eight different witnesses and submitted several exhibits—including photos of the junior Marines' burns. Appellant testified on his own behalf, part of which was rebutted by testimony from LCpl Delta. Appellant denied calling PFC Charlie a "beaner," and he denied punching him. He stated he believed the junior Marines consented to being burned. He admitted he struck PFC Bravo in the stomach but testified he did so in jest and to congratulate PFC Bravo on his increased fitness level.

---

[13] R. at 616.

*1. Evidence of Appellant Burning the Junior Marines with a Cigarette*

a. Private First Class Bravo

Of the three junior Marines, PFC Bravo was the most intoxicated that evening and admitted to not being able to remember many details. He testified that he did not "remember consenting to anything."[14] He could not recall pulling down his own shirt, though in an earlier interview with the trial counsel, it appears he said just that.[15] He acknowledged there were no burn marks on the shirt he wore that night and maintained that either he or Appellant pulled down his shirt to inflict the burn mark. When he was burned, PFC Bravo was standing at parade rest, but he described that as a voluntary decision because he was trying to look and feel more sober.

Lance Corporal Delta testified that Appellant held up his cigarette and said to PFC Bravo, "Okay, where do you want it?"[16] Appellant then approached him, pulled his shirt collar down, placed the cigarette up against his skin, and took a drag on the cigarette for about three to five seconds. Lance Corporal Echo testified that Appellant placed the cigarette on PFC Bravo's chest and took "two or three" puffs.[17] He also could not remember whether PFC Bravo pulled down his own shirt or not.

b. Lance Corporal Echo

Lance Corporal Echo admitted he pulled down his own shirt for Appellant after he burned PFC Bravo. He also admitted it was after Appellant said to him, "You get one too."[18] But, he maintained he only pulled his shirt down be-

---

[14] R. at 477.

[15] The trial counsel's "proover notes" were not admitted. Because this was an appellate exhibit used for cross-examination, rather than admitted evidence, we do not consider this document for factual sufficiency review. *United States v. Beatty*, 64 M.J. 456 (C.A.A.F. 2007). However, when shown the notes, PFC Bravo indicated they were the notes taken during his conversation with the trial counsel and that he recognized some of the notes as accurately recounting his prior statements. We consider this line of questioning solely for its impeachment value relating to PFC Bravo's ability to accurately recall these events and its tendency to show PFC Bravo had a better recall of facts that tended to inculpate vice exonerate Appellant.

[16] R. at 522.

[17] R. at 568.

[18] R. at 607.

cause he was told to do something by a superior. However, LCpl Delta contradicted LCpl Echo's testimony about his own actions. He testified that LCpl Echo did not pull down his own shirt.

### c. Lance Corporal Delta

Lance Corporal Delta testified that after Appellant burned the other two junior Marines, he turned to him. Appellant had only said, "Where do you want it" to the group once.[19] Both PFC Bravo and LCpl Echo had just been burned on their chest area beneath their collar. Lance Corporal Delta maintained that after watching Appellant burn both of the other Marines in the same place, Appellant came up to him, pulled up his shirt sleeve, and burned him on the shoulder. In addition, LCpl Delta denied he ever previously told the trial defense counsel that he moved his shirt or told Appellant he wanted to be burned on his chest.

### d. Appellant's Testimony

Appellant testified to a different order of the burnings. According to the junior Marines, it was PFC Bravo, LCpl Echo, and then LCpl Delta. Appellant's testimony was generally similar, but diverged in certain aspects. He testified that as he told the junior Marines about getting "burned" when he joined the communications platoon, he showed them his burn mark. Then, according to Appellant, the following exchange occurred:

> [Appellant]: Here, I'll give you one.
>
> [LCpl Delta]: Okay.
>
> [Appellant]: No, I am just kidding. I wouldn't do that.
>
> [LCpl Delta]: No. Do it. I want one![20]

Appellant testified that LCpl Delta wanted it on his forearm, but he chose not to burn him there because it would be easily visible. Lance Corporal Delta then said, "You could just move it up on my arm," and pushed his own shirt-sleeve up.[21] Appellant then burned him. After that, Appellant burned LCpl Echo and then PFC Bravo. However, these two junior Marines were both burned on the chest and below the collarbone as to avoid detection by medical personnel when getting required vaccines. Lance Corporal Echo told Appellant

---

[19] R. at 539.

[20] R. at 777.

[21] R. at 783.

he could burn him on his chest and pulled down his own shirt collar, as did PFC Bravo.

After this, the group continued socializing for another few minutes. Then Appellant gave PFC Bravo a "piggyback" ride down to the second deck to his room so he could change his shirt. At this point, Appellant suggested he go to sleep due to his intoxication, but PFC Bravo said he wanted to go back upstairs.[22] The Marines continued drinking and socializing for some time.

Appellant testified he sent text messages to PFC Bravo the next morning, asking about him and inviting him to the gym. Appellant also came to the barracks and saw PFCs Bravo and Charlie, and LCpl Echo, and gave them a dress cover that did not fit him. None of the junior Marines reported the incidents of the previous night, nor appeared inclined to do so.

### 2. The Military Judge's Instructions on Consent

The parties disagreed on the scope of the instruction the military judge should give to the members concerning assault consummated by a battery. Specifically, the Government urged the military judge to not include "mistake of fact" as to consent in the standard instructions or allow the Defense to even argue it.[23] The Government argued the rank disparity between Appellant and the junior Marines made it per se unreasonable for him to mistakenly believe they consented. The Defense requested language from Hawaii's pattern jury instructions that placed mistake of fact closer to the elements of assault consummated by a battery.[24] The military judge was not persuaded by either party's arguments and gave the standard instruction on a reasonable mistake of fact from the Military Judge's Benchbook [Benchbook].[25]

### 3. The Government's Rebuttal to Appellant's Testimony

During Appellant's testimony, he described how he conducted physical training [PT] for the data Marines during down-time at work. He had the Marines do pull-ups and other exercises. Over Defense objection, the military judge asked a panel member's three-part question.[26] The questions were whether Appellant was the only non-commissioned officer [NCO] present with

---

[22] R. at 791.

[23] App. Ex. XXXI.

[24] R. at 921.

[25] *See* Dept. of the Army Pam. 27-9, *Military Judges' Benchbook*, para. 5-11-2. (Sept. 10, 2014) [*Benchbook*].

[26] App. Ex. XXIII.

junior Marines during these PT sessions, how long they lasted, and whether Appellant "PT'd" alongside the Marines or merely instructed them. When asked, Appellant responded there were other NCOs present, the sessions would last approximately 10 to 15 minutes, and he would PT with the junior Marines.

In rebuttal, the military judge, over Defense objection, allowed the Government to present additional testimony from LCpl Delta. The Government proffered LCpl Delta's testimony would directly rebut Appellant's testimony by describing how Appellant entered his barracks room at 0100—on the first night LCpl Delta joined 3/3—and made him conduct physical training while Appellant watched.

The Defense objected to this testimony as improper under Military Rule of Evidence [M.R.E.] 403 and 404(b) and as a discovery violation. The Government demonstrated that it had in fact disclosed this statement to the Defense (but for some reason did not charge this conduct as a separate hazing offense). The military judge found that because the testimony was offered to specifically rebut Appellant's response to a member's question, and witness credibility was paramount, the danger of unfair prejudice did not substantially outweigh its probative value.

Lance Corporal Delta testified that on the day he arrived at 3/3, Appellant entered his barracks room (the door did not lock properly) at approximately 0100. Most of the battalion was at the PTA training exercise. Lance Corporal Delta had only met Appellant earlier in the day. Appellant told him, "Hey, wake up. The duty says there's too many cigarette butts downstairs. Let's go police call it."[27] Lance Corporal Delta interpreted that as an order and followed Appellant outside. Once outside, Appellant told him, "Skull drag and pick up all the cigarette butts."[28] A "skull drag" is a term for low-crawling using only one arm, causing one's head to drag along the ground. Appellant forced LCpl Delta to pick up cigarette butts for about fifty feet on a grassy field. Then he ran with LCpl Delta around the barracks building "a couple of times."[29] Appellant then smoked a cigarette while he ordered LCpl Delta to perform various exercises. This episode left LCpl Delta "confused" but not "angry."[30]

---

[27] R. at 876.

[28] R. at 877.

[29] R. at 878.

[30] R. at 882.

## II. DISCUSSION

### A. Standard of Review and the Law

Article 66, UCMJ, requires the service criminal courts of appeal to conduct a de novo review of the factual sufficiency of all cases it hears.[31] This "awesome, plenary, de novo power"[32] requires us to weigh all the admitted evidence and testimony at trial, make "allowances for not having personally observed the witnesses," and decide whether we are convinced of the accused's guilt beyond a reasonable doubt.[33] In doing so, we take a "fresh" and "impartial look at the evidence" and apply "neither a presumption of innocence nor a presumption of guilt."[34] This does not mean that a conviction must be "free from conflict,"[35] but it must be proven beyond a reasonable doubt—the highest standard known to the law. If the evidence admitted at trial leaves us, like a finder-of-fact at trial, with a "fair and reasonable hypothesis except that of guilt," we are required to set aside the conviction.[36]

Here, we review the assault convictions for factual sufficiency, but that factual analysis turns on Appellant's legal defense of mistake of fact as to the consent of the junior Marines. An assault consummated by battery is defined as "bodily harm to another . . . done without legal justification or excuse and without the lawful consent of the person affected."[37] And "bodily harm" is defined as "any offensive touching."[38] "[A]s a general matter, consent can convert what might otherwise be offensive touching into non-offensive touching."[39] Under Rule for Court-Martial 916(j)(1), even if an alleged victim did not actually

---

[31] *United States v. Walters*, 58 M.J. 391, 395 (C.A.A.F. 2003).

[32] *United States v. Kelly*, 77 M.J. 404, 406 (C.M.A. 1990) (quoting *United States v. Cole*, 31 M.J. 272 (C.M.A. 1990)).

[33] *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

[34] *Washington*, 57 M.J. at 399.

[35] *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

[36] *Benchbook*, para. 2-5-12.

[37] *Manual for Court-Martial, United States* (2016 ed.) [*MCM* (2016)] pt. IV, para. 54.c.(1)(a), (2)(a).

[38] *MCM* (2016) pt. IV, para. 54.c(1)(a).

[39] *United States v. Johnson*, 54 M.J. 67, 69 (C.A.A.F. 2000) (quoting *United States v. Greaves*, 40 M.J. 432, 433 (C.M.A. 1994)).

consent to an offensive touching, an accused cannot be convicted of assault consummated by battery if the accused mistakenly believed the alleged victim consented and that belief was "reasonable under all the circumstances."[40]

With respect to the offenses of hazing and aggravated assault, which the Government could possibly have charged in this case, the "opportunity to raise a consent defense"[41] would not exist. But with respect to the offenses charged here, that is, assault consummated by battery by Appellant burning three junior Marines with cigarettes, the defense of a reasonable mistake of fact is available and we must consider the facts and apply them.

## B. Appellant Mistakenly Believed the Junior Marines Consented

In our prior opinion, we found Appellant had an honest, albeit mistaken, belief that the three junior Marines consented to being burned. We still hold to that finding. We note the witnesses provided conflicting and impeached testimony on the question of whether they pulled their own shirts down to allow Appellant to burn their chests. Private First Class Bravo testified Appellant pulled his shirt down, but then could not recall if he had previously told the trial counsel that he pulled his own shirt down, before finally settling on an answer that either he or Appellant pulled his shirt down. Lance Corporal Echo testified he pulled his own shirt down, which oddly enough, was contradicted by LCpl Delta, who testified Appellant pulled LCpl Echo's shirt down. We also note none of the junior Marines testified to any physical or verbal resistance while this was happening, they continued socializing for some time afterwards, and they did not initiate reporting of these events to anyone. We cannot conclude beyond a reasonable doubt that Appellant did *not* honestly, though apparently mistakenly, believe the three junior Marines consented to being burned.

## C. The Government Did Not Disprove Appellant's Mistake of Fact Defense

In our first analysis, we declined to go into detail about whether it was reasonable under the circumstances because we incorrectly viewed public policy as ultimately barring a mistake of fact as to consent defense. The circum-

---

[40] R.C.M. 916(j)(1); *See also Greaves*, 40 M.J. at 433.

[41] *Mader II*, 81 M.J. at 108.

stances surrounding consent to an assault are, as a matter of law, not "reasonable" when such circumstances are a "mutual affray,"[42] where serious bodily injury occurs,[43] where there is a breach of public order,[44] or when the assault is committed "under circumstances as to which consent will not be recognized as a matter of law."[45]

The circumstances here were not a mutual affray and there was no substantial bodily harm alleged, although in some civilian jurisdictions, such as in Hawaii, a scar from a cigarette burn could constitute such harm.[46] It could

---

[42] *United States v. Wilhelm*, 36 M.J. 891, 893 (A.F.C.M.R. 1993). Our sister service court explained the "mutual combatant's status is not favored by the law" because both parties are "wrongdoers." The *Wilhelm* court also pointed out, as we did in *Mader I*, that consent must be *lawful* consent to be valid and that an illegal activity, such as a mutual affray, or, as we thought, an incident of hazing, would vitiate any consent. The *Wilhelm* court relied on CAAF's predecessor court, which in turn quoted the Supreme Court (*United States v. O'Neal*, 16 C.M.A. 33, 37, 36 C.M.R. 189, 193 (1966) (quoting *Rowe v. United States*, 164 U.S. 546, 556 (1896))). A mutual affray will not qualify for *lawful* consent, but as CAAF indicated in *Mader II*, the participants or victims of a hazing action can possibly give *lawful* consent when it is charged as an assault, despite consent not being a lawful defense to a hazing charge.

[43] *United States v. Atchak*, 75 M.J. 193, 195 (C.A.A.F. 2016) ("An individual cannot consent to aggravated assault.") (citing *United States v. Bygrave*, 46 M.J. 491, 494 (1997) (holding that Congress did not create exceptions for consent to acts likely to produce grievous bodily harm)).

[44] In *United States v. Holmes*, 24 C.M.R. 762 (A.F.B.R. 1957), an English woman had the habit of desiring physical beatings before sexual intercourse. On one occasion, appellant chased her from her home into the street around midnight. When he caught her and tried to return her to the home, she resisted and he knocked her to the ground and kicked her face with his bare feet. The commotion attracted "20 or 30 neighbors" who responded and gathered at the scene. *Holmes*, 24 C.M.R. at 763. Citing Wharton's Criminal Law and *The Queen v. Coney*, 8 QBD 534 (1882) (finding bare knuckle boxing unlawful), the Air Force Board of Review held that her consent was invalid because the "fight had the character of illegality" and that "an assault being a breach of the peace, and unlawful, the consent of the person struck is immaterial." *Holmes*, 24 C.M.R. at 764.

[45] *United States v. Boyett*, No. 98-00800, 1999 CCA LEXIS 66 (N-M. Ct. Crim. App. 1999) (unpublished) (citing *United States v. Bygrave*, 46 M.J. 491 (C.A.A.F. 1997); *United States v. Brantner*, 28 M.J. 941 (N.M.C.M.R. 1989); *United States v. Dumford*, 28 M.J. 836 (A.F.C.M.R. 1989)).

[46] *See* Haw. Rev. Stat. Ann. §§ 707–711(1)(a) and (d); *State v. Wilson*, No. 28478, 2009 Haw. App. LEXIS 4 (Haw. Ct. App. Jan. 7, 2009) (unpublished). The record is absent to whether this portion of MCB Hawaii had shared jurisdiction with the state of Hawaii. We also discern that the difference between this case and *United States v.*

be argued that a "breach of public order" occurs whenever a crime has been committed, and here, there was arguably a hazing incident that occurred in violation of the UCMJ. But we are unwilling to make such a leap that uncharged misconduct might provide the basis to bar Appellant's use of the mistake of fact defense.

We are also unwilling to deny the possibility of Appellant's mistake of fact defense solely because he was a sergeant and his alleged victims were junior Marines. Though the Government argues precisely this—that because Appellant was the "senior Marine" that his mistaken belief was unreasonable.[47] This would essentially be converting a potential hazing fact-pattern—which does not have the benefit of the mistake of fact consent defense—into an assault conviction. While military law is always on guard for "subtle pressure" due to differences in rank, we find none here that would undermine the reasonableness of Appellant's belief in the consent of the junior Marines.[48] He was not overbearing, giving commands, or yelling.[49] Even when Appellant suggested to PFC Bravo that he remain in his room and sleep due to his intoxication, the junior Marine ignored that suggestion and rejoined the group. When PFC Bravo was standing at parade rest to get burned by Appellant's cigarette, he testified that he did so, not because he was compelled, but to try to appear more sober. We also do not discern that Appellant inappropriately used his rank.

The cases the Government relies on are far from the one in front of us. In *United States v. Bradley*[50] and in *United States v. McFarlin*,[51] the circumstances were dramatically different concerning whether it was reasonable to mistakenly believe consent was given. In *Bradley*, an Army drill sergeant came

---

*Arab*, 55 M.J. 508 (Army Ct. Crim. App. 2001)–where the appellant was convicted of assault for burning his wife with a cigarette with her consent as part of sexual intercourse—is that the victim in *Arab* appeared to be subjected to extreme pain and did not actually consent.

[47] Appellee's Br. at 13.

[48] *United States v. Norris*, 55 M.J. 209, 215 (C.A.A.F. 2001). We believe it appropriate to consider whether the rank disparity contributed to the apparent consent of the junior Marines.

[49] *See United States v. Haverty*, 76 M.J. 199, 202 (C.A.A.F. 2017) (sergeant's use of "raised commanding voice" to a specialist prompted her to drink alcohol in hazing incident).

[50] *United States v. Bradley*, 28 M.J. 197 (C.M.A. 1989).

[51] *United States v. McFarlin*, 19 M.J. 790 (A.C.M.R. 1985). We note this case is persuasive authority only.

to the trailer of the wife of one of his trainees, whom had just been punished at an Article 15, UCMJ, proceeding. The drill sergeant threatened the wife with further punishment of her husband, including three years of imprisonment unless she complied with his demand to engage in sexual activity. The drill sergeant also used a "loud demanding voice" and "employ[ed] language indicating his power and control."[52] He also repeatedly ignored the victim's "pleaful entreaties to desist in his sexual demands."[53] The Government fares no better with *McFarlin*, a case where an Army staff sergeant, who was the direct supervisor of the victim—a private in a training command—committed an indecent assault when he presented his penis to her for oral sex and she complied. The Army court found that the consent defense was not "reasonably raised" in that case and her passive acquiescence was "reasonably attributable to appellant's superior rank and position."[54] The nature of whatever Appellant's rank, position, and authority over the junior Marines is a far cry from the obvious and apparent authority demonstrated in *Bradley* and *McFarlin*.

The record persuades us that the Government failed to prove beyond a reasonable doubt, both that Appellant was not under a mistaken belief that the junior Marines each consented to being burned, and that at the time of the offenses Appellant's mistake was unreasonable. The junior Marines testified under oath that they never consented to being burned. But the totality of the circumstances of the evening suggest, at least sufficiently enough to raise reasonable doubt as to his guilt, that Appellant's mistaken belief was a reasonable one. The evening's overall informality, the junior Marines' casual drinking of alcohol, their pulling down their shirts and presenting themselves, the nature of the "bonding ritual" similar to the one Appellant himself had once participated in, and the total lack of contemporaneous evidence the junior Marines objected, all undermine the Government's argument that Appellant's mistake of fact was unreasonable under the circumstances.

The question is also whether Appellant was negligent in failing to discover the true facts concerning the junior Marines' consent. Negligence is the absence of due care. Due care is what a reasonably careful person would do under the circumstances.[55] Here, the underlying nature of the act—what appears to

---

[52] *Bradley*, 28 M.J. at 200.

[53] *Id.*

[54] *McFarlin*, 19 M.J. at 794.

[55] *Greaves*, 40 M.J. at 437 n.5.

be an unlawful hazing ritual—is what complicates the issue. If the junior Marines were *willingly* participating in a hazing ritual, they could also be subject to prosecution.[56] From the record, it appears that *any* additional actions Appellant took to ascertain the true intent of the junior Marines to participate in this hazing ritual would have been met with a confirmation of their apparent desire to consent.

We also do not confuse an accused's negligence in discovering the true facts of consent with negligence in performing the underlying action. Otherwise, the "reasonableness" prong of mistake of fact defense would generally cease to exist as all offensive touchings are presumptively unlawful. Just because Appellant's act of burning the junior Marines with a cigarette appeared to be an unlawful hazing ritual, and not something a reasonably careful person would do in the first place, does not mean Appellant was not reasonably careful in ascertaining the true facts of the junior Marines' consent to the act. Otherwise we are essentially substituting a hazing conviction where Appellant's assault conviction failed. As CAAF stated in *Mader II*, "It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made."[57] We find the Government failed to prove beyond a reasonable doubt that Appellant's mistake of fact was neither honest nor reasonable under the circumstances. Thus, the evidence of his guilt of assault consummated by battery for burning the junior Marines with cigarettes is factually insufficient.

**D. Sentence Reassessment**

In our prior opinion, we set aside and dismissed with prejudice Specification 1 of Charge I for factual insufficiency. We also affirmed Specification 2 of Charge I and Specification 3 of Charge II. That portion of our opinion was affirmed by CAAF. We have now set aside and dismissed Specifications 1, 2, and 4 of Charge II. Appellant's only remaining convictions are those previously affirmed and arising from Specification 2, Charge I for violating Article 92, UCMJ, when Appellant called PFC Charlie a derogatory racial name, and from Specification 3 of Charge II for violating Article 128, UCMJ, when Appellant punched PFC Charlie in the stomach,

---

[56] Pros. Ex. 1, Marine Corps Order 1700.28B, *Hazing*, para. 3.b., (May 20, 2013) states that "No Marine . . . shall engage in hazing or consent to being the subject of hazing."

[57] *Mader II*, 81 M.J. at 108 (quoting *Cole v. Arkansas*, 333 U.S. 196, 201 (1948)).

We must now consider whether we can reassess the sentence pursuant to *United States v. Winckelmann.*[58] We consider the following factors:

> (1) [Whether there have been] [d]ramatic changes in the penalty landscape and exposure[;]

> (2) Whether an appellant chose sentencing by members or a military judge alone[;] . . .

> (3) Whether the nature of the remaining offenses capture[s] the gravamen of criminal conduct included within the original offenses and, in related manner, whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses[; and]

> (4) Whether the remaining offenses are of the type that judges of the courts of criminal appeals should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial.[59]

While there is some change in the sentencing landscape, it is not so dramatic that it warrants a new sentencing hearing. The maximum confinement Appellant faced for the three Article 128 specifications for burning the junior Marines plus the remaining specifications involving PFC Charlie was 48 months. It is now 30 months. Though the gravamen of Appellant's misconduct was the burning of the junior Marines with a cigarette—despite each of these actions only exposing him to six months of confinement for each act as compared to the two years of confinement for calling PFC Charlie a derogatory name—we are persuaded that the remaining specifications are of such a nature as to be readily familiar to the Court and we can reliably determine what would have been imposed at trial. We note that the military judge informed the members that Appellant had spent 178 days in pretrial confinement and advised them that he would be given day-for-day credit against any adjudged confinement.

Appellant's actions toward PFC Charlie were clearly unacceptable and unworthy of the trust and confidence of a noncommissioned officer of Marines, especially toward a junior Marine. Taking into consideration all of the evidence presented by the parties during pre-sentencing, we determine Appellant's reassessed, and legally appropriate, sentence is reduction to E-3.

---

[58] *United States v. Winckelmann*, 73 M.J. 11 (C.A.A.F. 2013).

[59] *Id*. at 15–16 (citations omitted).

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings for Specifications 1, 2, and 4 of Charge II are factually insufficient and are **DISMISSED WITH PREJUDICE**. The remaining, and previously affirmed, findings of guilty for Specification 2 of Charge I and Specification 3 of Charge II are correct in law and fact and, with regard to them, no error materially prejudicial to Appellant's substantial rights occurred.[60] The reassessed sentence is also correct in law and fact and without error materially prejudicial to Appellant's substantial rights.

The remaining findings and sentence, as reassessed, are **AFFIRMED**.

Chief Judge MONAHAN and Judge DEERWESTER concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[60] Articles 59 & 66, UCMJ.