# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

———————————

No. ACM 40563

———————————

**UNITED STATES**
*Appellee*

v.

**Brandon B. HUNT**
Senior Airman (E-4), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 16 May 2025

———————————

*Military Judge*: Tiny Bowman.

*Sentence*: Sentence adjudged 20 July 2023 by GCM convened at Seymour Johnson Air Force Base, North Carolina. Sentence entered by military judge on 25 January 2024: Dishonorable discharge, confinement for 9 months, and reduction to E-1.

*For Appellant*: Major Nicole J. Herbers, USAF; Captain Samantha M. Castanien, USAF; Scott R. Hockenberry, Esquire.

*For Appellee*: Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel J. Pete Ferrell, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Lieutenant Colonel G. Matt Osborn USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, MASON, and PERCLE, *Appellate Military Judges*.

Judge PERCLE delivered the opinion of the court, in which Senior Judge RICHARDSON and Judge MASON joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

PERCLE, Judge:

A panel of officer and enlisted members sitting as a general court-martial convicted Appellant, contrary to his pleas, of one specification of sexual assault, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] The military judge sentenced Appellant to a dishonorable discharge, confinement for nine months, reduction to the grade of E-1, and a reprimand. The convening authority took no action on the findings, disapproved the reprimand, and denied Appellant's request for deferment of the reduction in grade.

Appellant asserts six issues which we have reworded: (1) whether the military judge erred by denying Appellant's requests for specific instructions on how to evaluate post-penetration withdrawal of consent; (2) whether the military judge gave an incorrect prior inconsistent statement instruction and whether trial defense counsel was ineffective by failing to object to her instruction; (3) whether Appellant's conviction for sexual assault without consent is legally and factually sufficient due to the Government's charging scheme; (4) whether Appellant's conviction for sexual assault without consent is otherwise factually insufficient; (5) whether trial counsel gave improper findings argument; and (6) whether Appellant is entitled to relief for facially unreasonable appellate delay.[2]

We address issue (4), the factual sufficiency of Appellant's conviction. We agree with Appellant that the evidence is factually insufficient to support his conviction for sexual assault in violation of Article 120, UCMJ. We therefore set aside the findings of guilty as to the Specification of the Charge, the Charge, and the sentence. Because we set aside Appellant's only conviction, we do not address the remaining issues.

## I. BACKGROUND

### A. Before the Alleged Assault

Appellant and the alleged victim, MM, a civilian certified nursing assistant, met online just weeks before the night in question. The two chatted virtually and via text messages, eventually meeting for the first and only time at MM's house the evening of the alleged assault. Appellant arranged to drive several hours to MM's house after work, bringing his dog and planning to stay the night at MM's home. While Appellant was at MM's house, MM invited

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ and to the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant raised issues (5) and (6) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

Appellant to go on a double date with another couple, MM's friend NW and NW's date. The group of four went out for drinks and stayed out for a few hours, drinking and talking, without incident.

Around midnight, the same four people returned to MM's house. MM went alone to her room to change, and then Appellant joined her. Without discussion, Appellant and MM started kissing, and things progressed to consensual vaginal sex between MM and Appellant. Despite there being no discussion, MM testified that all initial and progressive sexual acts before the charged conduct were consensual. At some point during the same sexual encounter, Appellant asked MM if they could have anal sex—that is, Appellant asked MM if he could put his penis in her anus. MM hesitated, then after some convincing from Appellant with words to the effect of, "It will be fine. I will go easy," MM verbally agreed to anal sex. Specifically, MM told Appellant they could try anal sex, but said, "[I]f I say stop, then stop." MM was face down on the bed and Appellant was behind her when this conversation regarding consent occurred, and MM remained in that general position when the sexual act in question started.

### B. MM's Recall of the Alleged Assault

MM's recall of the alleged assault varied regarding what occurred after Appellant requested and obtained consent to start the charged sexual act of penetrating her anus with his penis. In addition to her sworn testimony in court, MM made several out-of-court statements about this alleged assault.[3][4]

#### 1. MM's 9-1-1 Call

A portion of MM's 9-1-1 call which occurred minutes after the alleged assault was entered into evidence. On the 9-1-1 recording, MM told the operator:

> I met this guy. We had been talking for a little while, and we went out drinking tonight. I was planning on sleeping with him, whatever. We come back to my house, and he basically raped me. Um, I told him to stop when he tried to do anal, and he would not stop. Now, he is refusing to get out of my house.
>
> . . . .

---

[3] We note the facts of this case consist of many out-of-court statements made by MM, Appellant, and others. Unless expressly noted, all statements referenced in this opinion were admitted substantively at trial, without any limitations.

[4] None of the witnesses at trial, including MM, identified Appellant as the same person who was at MM's house that evening and committed the alleged assault. However, this issue was not raised by the Appellant, and we find no prejudice.

[H]e kept saying, like, "I am just going to stick it in your a[**]," and I was, like, "Please don't. I don't do that," and he was like "No, I am going to. It will be fine. I will go easy," and I was, like, "Please don't."

. . . .

Then he did anyways.

. . . .

I said, yes, to sex, like regular sex, not anal.

**2. MM's Statement to Responding Officers on the Night of the Alleged Assault**

The police arrived at MM's house that evening because of the 9-1-1 call to get Appellant out of her house. MM made statements to the local law enforcement officials from her bedroom the night of the incident. In this interview, MM told police that "[Appellant] said 'I am going to stick it in your a[**]' or asked for anal sex, something to that effect." MM told police her response to Appellant was, "'No, I have never done that,'" and that Appellant responded, "It will be fine. I will go easy." MM told police she then said to Appellant, "Okay, but if I say stop, then stop." MM testified she told police this conversation all occurred before Appellant began penetration of her anus. MM testified she also told police that after penetration started MM said to Appellant, "[S]top, stop, stop," and that MM had to "push him off" and then Appellant stopped.

Officer FN, one of the responding police officers, also testified at trial about this conversation. He recalled that MM told him,

> [Appellant] asked [MM] if he could have anal sex with her and she said, yes [she] would have anal sex with him, but [she] had never done it before, but [she] did say [they] could do it. She said that when he was doing it, it started hurting, so she told him to stop, and [he] did not stop.  He kept doing it. She said she told him again to stop, and he didn't stop. She said she told him three times to stop, and then she started – she said she started crying, and he eventually did stop.

Officer FN tried asking MM to give a timeframe for how far apart MM's "stops" were spoken to Appellant, but MM "wouldn't" give him a timeframe.

**3. MM's Statement to NW on the Night of the Alleged Assault**

NW, who considers MM one of her best friends, testified at trial. She recalled that Appellant and MM were in MM's room for about 45 minutes. When NW saw MM come out of the room, she described MM as "distraught," "shaky" and crying. NW and MM went into the bathroom and talked about the alleged

assault. NW said MM told her that MM "had consented to having vaginal sex with [Appellant,] and then [Appellant] had flipped her over on her stomach and started having anal intercourse with her, and she kept telling [Appellant] to stop and he wouldn't stop . . . . [MM] was like[,] 'Stop, stop, stop, get off of me.'" NW also testified that MM told her when she was saying stop, "[Appellant] had put his hand over her mouth so she couldn't talk."

### 4. MM's Statement to her Mother on the Night of the Alleged Assault

MM talked to her mother about what happened that evening when her mother came over to stay with her. MM never told her mother she had originally consented to anal sex with Appellant—it was revealed to her mother for the first time when MM's mother testified at trial on cross-examination.

### 5. MM's Statement to OSI Weeks after the Alleged Assault

When MM was interviewed by Air Force Office of Special Investigations (OSI) a few weeks after the incident, she told OSI that there was not "any point that [he] asked [her] for anal or that [she] told him he could perform anal." MM further said to OSI agents that "[Appellant] never asked and [she] told him [she] didn't like it when he tried." When confronted about this version of events at trial, MM testified that what she told OSI was "not the truth."

### 6. MM's In-Court Testimony

Appellant's trial occurred over a year after the incident. At trial, MM testified that Appellant began penile penetration of her anus. MM testified, "As soon as I started to feel it go inside of me, I said 'Stop' and I said 'Stop, please, stop. I don't like it. It hurts." MM testified that Appellant replied to her, "Shhh, shhh, shhh it feels good." MM then testified she kept saying "stop" and, in response, Appellant put his hand over her mouth. MM then testified the anal penetration lasted "a few minutes." MM said at some point she "blanked out" and "just felt like [she] wasn't there." Eventually MM testified that she tried to "pull [herself]" away from Appellant using her headboard, and after two attempts Appellant got off her and MM rolled to the side of her bed. MM testified she curled up in the "fetal position." MM testified Appellant stopped having anal sex, and did not ejaculate when he stopped. MM asked Appellant to "go home," and Appellant got angry at the request to leave because he lived so far away, he had been drinking, and he previously had been invited to stay the night. MM testified she then left her room, with Appellant still in it, to find her friend NW. She then called the police to get Appellant out of her house.

## C. Appellant's Statements About the Alleged Assault

According to MM's testimony, when Appellant stopped having anal sex with her, Appellant asked her to "snuggle," "cuddle" and "lay with [him]." MM said no, got dressed and told Appellant to "go home."

When NW confronted Appellant about the anal sex immediately afterwards, Appellant became angry. Appellant yelled back, "Were you in the room?" several times. Appellant told NW that "[MM] was crazy and that [MM] agreed to it and that he wasn't leaving because he had been drinking and [MM] invited him to stay." When NW accused Appellant that he "didn't stop" Appellant replied "emphatically" that "[he] did stop."[5]

The day after the alleged assault, MM sent a text message to Appellant, stating, "Why did you do that to me?" followed by "Thanks for not stopping when I asked you to. I really appreciate it."[6] Appellant responded to those messages from MM by saying "I did. I f[**]king did."

Although Appellant had been drinking that evening and did not want to drive, MM testified that in her opinion, neither she nor Appellant were "drunk," and that Appellant was not slurring his words or stumbling. Officer FN testified that Appellant was "obviously impaired" and "unsteady on his feet."

**D. After the Alleged Assault**

After Appellant left MM's apartment at the direction of the police, Appellant slept in his car and never returned to MM's apartment or saw her again.

MM told police that night she did not want to press charges against Appellant, explaining, "At the time, I was trying to get custody of my niece, and I didn't want it to look bad on me and I didn't want it to look like I was unstable and unfit to take care of her;" and "I thought that because he was in my home that they wouldn't think it was a safe place for her to be."

When asked about the inconsistent accounts of what happened, MM testified, "To me, in my mind, it was different because we had agreed upon it under the stipulation that if I said stop, he would stop, which he didn't."

---

[5] This statement was elicited during cross-examination of NW, although its substantive value is very low given how the examination transpired. NW was challenged by trial defense counsel about this statement she had made to OSI close in time to the incident. At trial, NW testified she did not remember making this statement to OSI. She also agreed it was a long time ago that she made the statements and agreed she made her statement to OSI closer in time to the incident. However, she never affirmatively adopted or denied making this statement, and it was not otherwise entered into evidence.

[6] We assume this statement by MM was meant sarcastically.

Trial counsel ended MM's direct examination with the following questions and answers:

> [Trial Counsel (TC):] When the accused penetrated your anus, did you consent after that?
>
> [MM:] No.
>
> [TC:] Did you make it known to him that you didn't consent?
>
> [MM:] Yes.

The Defense requested the military judge give the mistake of fact as to consent instruction, and the military judge properly instructed members on the affirmative defense of mistake of fact as to consent.

## II. DISCUSSION

### A. Law

#### 1. Factual sufficiency.

We review questions of factual sufficiency when an appellant asserts an assignment of error and shows a specific deficiency in proof. *United States v. Harvey*, 85 M.J. 127, 129 (C.A.A.F. 2024) (citing Article 66(d)(1)(B)(i), UCMJ, 10 U.S.C. § 866(d)(1)(B)(i), *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*)). The current version of Article 66(d)(1), UCMJ, states:

> (B) FACTUAL SUFFICIENCY REVIEW.
>
> > (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon a request of the accused if the accused makes a specific showing of a deficiency of proof.
> >
> > (ii) After an accused has made such a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—
> >
> > > (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and
> > >
> > > (II) appropriate deference to findings of fact entered into the record by the military judge.
> >
> > (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B) (2024 *MCM*). This factual sufficiency standard applies to courts-martial in which every finding of guilty in the entry of judgment is for an offense occurring on or after 1 January 2021. *See* The National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 542(e)(2), 134 Stat. 3388, 3612–13 (1 Jan. 2021).

"[T]he requirement of 'appropriate deference' when a [Court of Criminal Appeals] 'weigh[s] the evidence and determine[s] controverted questions of fact' . . . depend[s] on the nature of the evidence at issue." *Harvey*, 85 M.J. at 130 (third and fourth alterations in original). It is within this court's discretion to determine what level of deference is appropriate. *Id.*

"[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id.* at 131 (internal quotation marks omitted).

For this court "to be 'clearly convinced that the finding[s] of guilty [were] against the weight of the evidence,' two requirements must be met." *Id.* at 132. First, we must decide that evidence, as we weighed it, "does not prove that the appellant is guilty beyond a reasonable doubt." *Id.* Second, we "must be clearly convinced of the correctness of this decision." *Id.*

### 2. Elements

As charged, the elements for sexual assault are that (1) Appellant committed a sexual act upon MM by penetrating MM's anus with Appellant's penis; and (2) that Appellant did so without MM's consent. *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(2)(d). "Sexual act" is defined, as relevant here, as "the penetration, however slight, of the penis into the vulva or anus or mouth." *MCM*, pt. IV, ¶ 60.g.(1)(A). "Consent" is defined as "a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A). "Submission resulting from the use of force, threat of force, or placing another person in fear also does not constitute consent." *Id.* "A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue does not constitute consent." *Id.* "All the surrounding circumstances are to be considered in determining whether a person gave consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(C).

### 3. Withdrawn-Consent Cases

The United States Army Court of Criminal Appeals (ACCA) analyzed a forcible sodomy case in which the victim initially consented to engaging in anal sex with the appellant, but then withdrew her consent after the sexual act had

begun. *United States v. Rouse*, 78 M.J. 793, 794–95 (A. Ct. Crim. App. 2019). Our sister court concluded that consent to a sexual act may be withdrawn at any time, including after the sexual act has begun. *Id.* at 796. In a footnote, the ACCA stated, "We also note that an analogous principle applies to the offense of sexual assault by bodily harm. Both common sense and the law dictate that once consent to a sexual act is withdrawn, the sexual act must cease." *Id.* at 798 n.8.

In *United States v. Jones*, No. ACM 39543, 2020 CCA LEXIS 207 (A.F. Ct. Crim. App. 22 Jun. 2020) (unpub. op.), a panel of this court had an opportunity to address *Rouse*. While this court in *Jones* lauded the ACCA's extensively researched opinion, it concluded, "Although this court has not previously had occasion to decide the issue, we doubt [a]ppellant's assertion that a person cannot effectively withdraw consent to sexual intercourse after penetration has occurred." *Id.* at \*19. The *Jones* court did not further adopt or refute *Rouse*.

Beyond acknowledging a victim's legal right to withdraw consent at any time, the court in *Rouse* also outlined the logical question posed in withdrawn-consent cases: "[A]t what point does continuation of a once-consensual sexual act, after consent to the act is withdrawn, become the crime of forcible sodomy?" 78 M.J. at 797. In answering its own question, the court noted, "We have found no precedential military cases addressing this issue." *Id.* The ACCA concluded, specific to forcible sodomy, that "an accused may be convicted under Article 125[, UCMJ, 10 U.S.C. § 925, *Manual for Courts-Martial, United States* (2008 ed.),] if he or she uses *force* to continue commission of an ongoing sexual act after consent to such sexual act has been withdrawn." *Id.* (emphasis added). Thus, the ACCA concluded that "[t]he crucial question is whether an accused continued the sexual act by the use of force after consent was withdrawn." *Id.* The ACCA noted an important distinction in this holding. The *Rouse* case differs from

> cases alleging sexual assault where the alleged sexual act and bodily harm were one and the same. In such situations, consent—*and nothing else*—separates innocent from wrongful conduct. In [*Rouse*], as in all cases alleging a sexual act by force, it is not innocent conduct to accomplish the sexual act *by force*. . . . While sexual acts are ordinarily innocent, *forcible* sexual acts— whether the force was actual or constructive—are not.

*Id.* at 798 n.10 (citations omitted).

### 4. Defense of Mistake of Fact as to Consent

"[I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty

of the offense." Rule for Courts-Martial (R.C.M.) 916(j)(1). If the mistake goes to an element requiring general intent, it "must have existed in the mind of the accused and must have been reasonable under all the circumstances." *Id.* Therefore, an honest and reasonable mistake that the victim consented to the charged sexual contact is an affirmative defense to the charged offense. *See, e.g.*, *United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019) (considering the defense of mistake of fact to a charge of sexual assault). Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1); *see McDonald*, 78 M.J. at 379.

In considering whether the defense of mistake of fact as to consent was raised at trial, we "consider the totality of the circumstances at the time of the offense" and consider "whether the record contains some evidence of an honest and reasonable mistake to which the [factfinder] could have attached credit if they had so desired." *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F. 2003) (citations omitted). While the quantity of evidence required is low, the record must contain evidence supporting both the subjective "honest" and the objective "reasonable" mistaken belief. *See United States v. Davis*, 76 M.J. 224, 230 (C.A.A.F. 2017) (citation omitted) ("[W]hile [the a]ppellant's statement may constitute a scintilla of evidence about his 'honest belief,' . . . there is not an iota of evidence that such a belief was reasonable."); *see also United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995) (citation omitted) ("The testimony relied on by appellant tended to show objective circumstances upon which a reasonable person might rely to infer consent. However, they provided no insight as to whether appellant actually or subjectively did infer consent based on these circumstances.").

When determining what is reasonable, we know that "'[d]ue care' is 'such care as would be exercised by an ordinarily prudent [person] when sober.'" *United States v. Harrington*, No. ACM 39825, 2021 CCA LEXIS 524, at *17 (A.F. Ct. Crim. App. 14 Oct. 2021) (unpub. op.) (quoting *United States v. Bragg*, 4 C.M.R. 778, 782 (A.F.C.M.R. 1952); then citing RESTATEMENT (SECOND) OF TORTS § 283C cmt. d (AM. LAW INST. 1965) (If a drunken person's "conduct is not that of a reasonable man who is sober, his voluntary intoxication does not excuse" conduct that would otherwise be negligent.)), *rev'd on other grounds*, 83 M.J. 408 (C.A.A.F. 2023); *see also United States v. Moore,* No. ACM S32477, 2018 CCA LEXIS 560 at *12 (A. F. Ct. Crim App. 11 Dec. 2018) (unpub. op.) (citation omitted) ("This defense has two elements: one subjective and one objective. For the subjective element, the ignorance or mistake must have existed in Appellant's mind. For the objective test, the ignorance or mistake must be reasonable under all the circumstances as assessed by an ordinary, prudent, sober adult.").

The concept of "reasonably prudent person" is an objective standard. *Harrington*, unpub. op. at *17. "The actor is required to do what this ideal individual would do in his place. The reasonable man is a fictitious person, who is never negligent, and whose conduct is always up to standard." *Id.* at *17–18 (citing RESTATEMENT (SECOND) OF TORTS § 283 cmt. c (AM. LAW INST. 1965)); s*ee also Military Judges' Benchbook* (hereinafter *Benchbook*), Dept. of Army Pamphlet 27-9 at 1425 (29 Feb. 2020) ("A reasonable belief is one that an ordinary, prudent, sober adult would have under the circumstances."). "Voluntary intoxication does not permit what would be an unreasonable belief in the mind of a sober person to be considered reasonable because the person is intoxicated." *Benchbook*, at 1425–26.

In *United States v. Greaves*, 40 M.J. 432, 437 n.5 (C.M.A. 1994), our superior court stated,

> It would seem that one is not being reasonable if one is being reckless or negligent. Thus it would seem that for one reasonably to believe something, one must have taken such measures as to not be reckless or negligent with respect to the truth of the matter. In other words, one must be seen as exercising due care with respect to the truth of the matter in issue.

"If a mistake is honest yet 'patently unreasonable,' the defense is unavailable to an appellant." *United States v. Rodela*, 82 M.J. 521, 526 (A.F. Ct. Crim. App. 2021) (quoting *Davis*, 76 M.J. at 230).

## B. Analysis

Appellant argues his conviction is factually insufficient due to the weakness of the Government's proof at trial discussed below. The Government argues, *inter alia*, "overwhelming evidence shows Appellant continued to anally penetrate MM well after she withdrew her consent." At trial, and on appeal, the Government does not address the affirmative defense of mistake of fact as to consent.

Appellant has made a request for a factual sufficiency review. At trial and in his brief on appeal, Appellant alleges that the central issue in this case was the withdrawal of consent and its aftermath. More specifically, Appellant alleges the Government failed to disprove the real possibility that the charged sexual act ceased promptly upon MM's withdrawal of consent, citing MM's inconsistent statements. Appellant also asserts that "[s]topping was a defense" and—quoting the Government's brief—suggests the Government failed to prove that Appellant had the clear ability to avoid criminality by stopping the act after MM said stop.

We find Appellant's claim is sufficient to trigger a factual sufficiency analysis because Appellant alleged both "an assertion of error" and made "a

11

showing of deficiency of proof." *Harvey*, 85 M.J. at 130. After conducting our factual sufficiency review, we agree with Appellant that the Government has failed to carry its burden of proof as it relates to MM's consent, MM's withdrawal of consent, and the aftermath. After conducting our review regarding consent we conclude there is a real possibility that Appellant held both an honest and reasonable mistake of fact as to MM's consent during the charged sexual act, and that the Government has failed to disprove this defense beyond a reasonable doubt. For this reason, we find Appellant's conviction factually insufficient.

### 1. Overview

While the *Rouse* analysis is a helpful reference in withdrawn-consent cases, it is not entirely applicable here as it required both proof of withdrawn consent and of a sexual act with force. In other words, the *Rouse* analysis was narrowed by the requirement that the sexual act was done with force. Still, we pick up this case where the *Rouse* court left off by asking the next question: What happens in withdrawn-consent cases when force is not an element? Specifically, at what point does continuation of a once-consensual sexual act, after consent to the act is withdrawn, become a crime of a sexual nature when consent—and nothing else—separates innocent from wrongful conduct?

We approach this area of the law in the narrow, fact-specific analysis of this case, considering all the surrounding circumstances and keeping in mind that it is the Government who bears the burden of proof. We tread carefully in this area of the law as phrases like "Don't stop" and "Don't, stop!" separate the innocent acts from the criminal acts.

To begin, we expressly agree with the *Rouse* court that consent to a sexual act can be withdrawn at any time, even after the sexual act has begun. *Rouse*, 78 M.J. at 796. We also find that consent for a sexual act, once given, is presumed continuous until withdrawn, and consent is to be determined objectively and from the alleged victim's perspective. *McDonald*, 78 M.J. at 380 (citation omitted).

We further hold that in a withdrawn-consent case, an accused is guilty of sexual assault without consent when the Government proves beyond a reasonable doubt that an accused continues the charged sexual act after the revocation of consent by the victim. We find that the defense of mistake of fact as to consent, if reasonably raised by the evidence, also applies in withdrawn-consent cases and that the Government continues to bear the burden to prove that, in such circumstances where consent was given and then withdrawn, the accused did not have an honest and reasonable mistake of fact as to consent for

the continued sexual act.[7] "Factors a court-martial may use to determine whether an accused had an honest and reasonable mistake of fact as to continued consent will vary based on the facts and circumstances of each case." *Rouse,* 78 M.J. at 798 n.9. While none of this is new law, we wanted to succinctly summarize the applicable law in withdrawn-consent cases.

As applied to the facts of this case, we find that the Government has not met this burden to disprove mistake of fact as to consent beyond a reasonable doubt, and therefore Appellant's conviction is factually insufficient.

**2. MM's Withdrawn Consent**

In this case, it is not disputed that Appellant asked MM for consent to have anal sex and waited to start anal penetration until he obtained affirmative consent from her.[8] Put another way, it is not disputed that Appellant legally and with consent penetrated MM's anus with his penis at the onset of the charged sexual act.

We next ask if the Government proved beyond a reasonable doubt that MM objectively withdrew her consent for the charged sexual act. Viewed objectively and from MM's perspective, we find the Government proved MM withdrew consent. The most consistent testimony to this effect is that MM said the word "stop" to Appellant at least once after he had started the sexual act, thereby withdrawing consent to the sexual act. Even Appellant, by his own admissions, acknowledged that MM said "stop" to the charged sexual act. Therefore, we need not belabor the point that MM objectively withdrew consent to the charged sexual act.

**3. Appellant's Mistake of Fact as to Consent**

The remaining facts are, at best, confusing, or, at worst, in conflict as to how the revocation of consent occurred and was understood. The Government's own witnesses substantively testified to various durations of the alleged nonconsensual act as well as inconsistent actions by Appellant and MM related to the withdrawn-consent interaction. This ambiguity matters because the facts

---

[7] The *Rouse* court noted, but did not address, that "there could be a claim that verbal or nonverbal communications withdrawing consent during a consensual sexual act may not have been clearly conveyed and understood." *Rouse*, 78 M.J. at 798 (footnote omitted). The ACCA further noted, in a footnote, "[a]n accused who maintained an honest and reasonable mistake as to the continued consent of the other party is not criminally culpable for continuing the sexual act." *Rouse*, 78 M.J. at 798 n.7 (citing Rule for Courts-Martial 916(j)).

[8] The law is clear that one should affirmatively obtain consent prior to starting a sexual act. *See McDonald*, 78 M.J. at 381 ("The burden is on the actor to obtain consent, rather than the victim to manifest a lack of consent.").

surrounding the revocation of consent are relevant to the analysis of both the charged sexual act, consent, and the defense of mistake of fact as to consent. Significant inconsistencies in or patent refusals to clarify details on revocation or unwanted sexual acts seriously undercut the Government's burden to prove this case beyond a reasonable doubt. While this is true in every sexual assault case, we emphasize need for clarity and precision, particularly in withdrawn-consent cases where consent, and only consent, separates the criminal actor from the innocent.

The issue in this case hinges on mistake of fact as to consent. Curiously, despite the miliary judge giving this instruction to members after a trial defense counsel request and after finding it reasonably raised by the evidence, neither trial counsel nor government counsel on appeal substantively address this defense or how the Government has disproved Appellant's honest and reasonable mistake of fact as to consent beyond a reasonable doubt.[9]

We find that the affirmative defense of mistake of fact as to consent was reasonably raised by the evidence in this case.[10] Some evidence that Appellant held an honest belief he had consent from the victim for the duration of the sexual act includes, but is not limited to, the following: (1) when finished with the sexual act, Appellant wanted to cuddle with MM; (2) when confronted by MM about the alleged assault, Appellant said he did stop when she asked; and (3) when confronted by NW about the alleged assault, Appellant said he did stop when asked. We note that while statements of an accused can be self-serving, here Appellant did not apologize or make excuses for his behavior, but unequivocally and to the point of anger insisted he did stop when MM asked him to. The evidence reasonably raised the possibility that, in Appellant's mind, the accusation of wrongdoing was unjust based on his honest belief he had done no wrong and in fact listened to MM. This honest belief is also consistent with Appellant's earlier behavior that evening with MM, showing he understood and respected the need to request and obtain MM's consent for all other sexual acts.

---

[9] For example, trial counsel's emphasis at the end of MM's testimony focused on the facts that MM withdrew consent and that the charged sexual act continued after the withdrawn consent. Were this a *Rouse* case (sexual assault by force), such testimony may have been enough to carry the Government's burden. But the Government's burden here goes beyond proving those two elements (sexual act and without consent) because Appellant raised the defense of mistake of fact as to consent.

[10] In finding there was a real possibility a reasonable mistake of fact as to consent existed, we did not consider Appellant's level of intoxication, if any.

We also see evidence in the record which shows Appellant's belief as to consent for the charged sexual act was reasonable. Appellant requested and obtained consent for the charged sexual act and could presume it was continuous unless and until MM withdrew consent. In this withdrawn-consent case, it was presumably reasonable to believe MM continued consenting to the act because she had just expressed her consent to this act. Alternatively, looking at *Greaves*, we note Appellant's belief that MM consented to the charged sexual act was not patently unreasonable because, from the perspective of a reasonable person in Appellant's position, he was not reckless or negligent to the truth of the matter of MM's consent having requested and obtained MM's consent. 40 M.J. at 437 n.5. Appellant acted with reason in so doing. We also consider that Appellant and MM had no prior experience with each other, and that MM was in a position facing down and away from Appellant during the charged sexual act. Therefore, Appellant's belief that MM consented to the sexual act after she gave consent was reasonable until it became unreasonable from the perspective of a reasonable person in Appellant's position.

### 4. Proof Overcoming Mistake of Fact as to Consent Beyond a Reasonable Doubt

Having found the mistake of fact as to consent was reasonably raised by the evidence, we look to see if this defense was disproved at trial beyond a reasonable doubt. It was not.

Appellant's belief MM consented to the charged sexual act would become patently unreasonable if he heard MM tell him to stop the penetration, and then continued the charged sexual act.[11] Based on the facts of this case, we acknowledge it is a real possibility Appellant heard MM say "stop" and continued the charged sexual act. However, we do not find the Government proved beyond a reasonable doubt that continuation of the sexual act without consent was the only real possibility. There was also a real possibility that Appellant used due care but was not aware MM withdrew consent and therefore unknowingly proceeded with the sexual act for some duration without her consent until he heard and understood her withdraw consent, and stopped.

---

[11] Less important to our analysis, but worth highlighting, is the ambiguity of a word like "stop" in withdrawn-consent cases when penetration has already begun. In the throes of passion where consensual penetration has occurred, the word "stop" may have several meanings including but not limited to "stop moving" or "stop going further" or "stop the act and withdraw." The possibilities of the communication, or miscommunication, related to a word like "stop" in withdrawn-consent cases highlight the need for the Government to elicit specific information at trial for a trier of fact to understand and assess each allegation of sexual assault to meet their burden of proof.

We acknowledge some testimony of MM and NW conflicts with this alternate real possibility, namely that MM testified she said "stop" in potentially a loud voice and that after she said "stop" Appellant covered her mouth and spoke to her while continuing the sexual act. We also acknowledge it is also possible the unwanted penetration occurred for "minutes," where reasonableness of the mistake may diminish. It is possible that then MM had to pull herself away from or push Appellant away from her to get him to stop.[12]

However, we agree with Appellant that the evidence presented an alternate real possibility that when Appellant, using due care, *heard* MM withdraw consent for the sexual act, Appellant immediately stopped. We acknowledge it is possible MM said "stop," perhaps more than once, before Appellant heard and understood her. Importantly, however, while MM's versions of events that evening varied, Appellant's never did. This alternate real possibility that Appellant was honestly and reasonably mistaken as to MM's consent is not only supported with Appellant's actions and statements after the alleged assault, but by certain versions of MM's own statements recorded closer in time to the event. For example, MM's report to police on the night in question was that MM said "stop, stop, stop," to Appellant and that MM had to "push him off" and then Appellant stopped. Nothing in this near-contemporaneous report suggested Appellant talked to MM after her saying "stop" or that Appellant covered her mouth and continued the sexual act. When asked by police on the night in question, MM overtly refused to say how far apart the "stops" were or how long this interaction withdrawing consent lasted. As to the mouth covering, some of MM's other accounts of the evening, given closer in time to the charged event, raise also the real possibility that instead of Appellant covering MM's mouth and continuing with the sexual act post-withdrawal of consent, Appellant told MM it will "feel good" only *before* he started penetration while he was convincing her to initially consent.

In the end, given the time of day of the alleged assault, position of MM relative to Appellant, each person's lack of familiarly with the other, and substantively inconsistent accounts of the charged sexual act and withdrawn

---

[12] This theory requires full credit to be given to MM's in-court testimony. The Government argues MM is very credible, in part, because she had no motive to lie about what happened with Appellant. However, testimony from MM adduced at trial was that MM did at one point lie to OSI about what happened with Appellant. Further, there was motive elicited at trial explaining why MM did not want to file a report about the alleged assault. This motive was that MM was trying to appear stable or safe so she could obtain custody of her niece, and that a near stranger like Appellant being in her home under these circumstances arguably cuts against that appearance. The same motive could have been present and motivated her testimony at trial. Regardless, we did not give much weight to these motives in our factual sufficiency analysis.

consent, we are left clearly convinced the evidence "does not prove that the appellant is guilty beyond a reasonable doubt," as to the events surrounding the withdrawn consent and the aftermath, even when considering and giving appropriate deference to the fact that the members heard and saw the witnesses testify. We can believe both MM's genuine emotional reaction to Appellant's conduct, including her 9-1-1 call, and Appellant's genuine anger at the accusation of wrongdoing and the request to leave being reasonable under the circumstances. This tension between the two real possibilities of how these events played out highlights why the Government has not met its burden of proof in this case. Simply put, the Government did not disprove the honest and reasonable mistake of fact Appellant had as to MM's consent for the charged sexual act in this post-penetration withdrawn-consent case. Therefore, the Government has failed to meet its burden to prove a sexual assault occurred beyond a reasonable doubt.

Nothing in this opinion should be read to conclude that an accused can willfully ignore a clear withdrawal of consent to any sexual act—one must act reasonably under the circumstances and with due care. We note that the trier of fact must individually evaluate all the circumstances in each case. Where the evidence raises a mistake of fact defense, the burden is on the Government to prove a crime was committed beyond a reasonable doubt.

After weighing all the evidence and having given appropriate deference to the fact that the trial court saw and heard the witnesses, we find that the finding of guilty was against the weight of the evidence and therefore, is factually insufficient. We are clearly convinced of the correctness of our decision.

### III. CONCLUSION

The findings of guilty and the sentence are **SET ASIDE**. The Charge and its Specification are **DISMISSED WITH PREJUDICE**. All rights, privileges, and property, of which Appellant has been deprived by virtue of the findings and sentence set aside by this decision, are ordered restored. *See* Articles 58b(c) and 75(a), UCMJ, 10 U.S.C. §§ 858b(c), 875(a).

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court