# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

## No. ACM 40655 (f rev)

————————————

### UNITED STATES
*Appellee*

v.

### Dioderson AUGUSTIN
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 21 January 2026

————————————

*Military Judge*: Tyler B. Musselman.

*Sentence*: Sentence adjudged 29 March 2024 by GCM convened at Tyndall Air Force Base, Florida. Sentence entered by military judge on 2 July 2024: Dishonorable discharge, confinement for 36 months, and reduction to E-1.

*For Appellant*: Major Trevor N. Ward, USAF; Mr. Frank J. Spinner, Esquire.

*For Appellee*: Colonel Matthew D. Talcott, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Major Vanessa Bairos, USAF; Major Kate E. Lee, USAF; Major Jocelyn Q. Wright, USAF; Captain Donnell D. Wright, USAF; Mary Ellen Payne, Esquire.

Before GRUEN, PERCLE, and MORGAN, *Appellate Military Judges*.

Judge PERCLE delivered the opinion of the court, in which Senior Judge GRUEN and Judge MORGAN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

PERCLE, Judge:

Appellant was found guilty, at a general court-martial consisting of officer members, contrary to his pleas, of two specifications of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920, and one specification of indecent conduct in violation of Article 134, UCMJ, 10 U.S.C. § 934.[1,2] The military judge sentenced Appellant to a dishonorable discharge, confinement for 36 months, and reduction to the grade of E-1. Appellant requested the convening authority defer the automatic forfeitures until entry of judgment. The convening authority denied his request. Appellant also requested waiver of all automatic forfeitures for the benefit of his dependent, and the convening authority waived all automatic forfeitures for a period of six months. The convening authority took no action on the findings and the sentence.

On 13 November 2025, we ordered the Government to show cause as to why we should not remand the record for correction due to an error on the entry of judgment (EoJ). On 19 November 2025, the Government conceded error but asked this court to find no prejudice or to cure the error ourselves. On 20 November 2025, we remanded the case for correction of the record by the Chief Trial Judge or delegee. The record was returned to the court on 16 December 2025 with a corrected EoJ and re-docketed with this court this same date.

Appellant raises two issues on appeal, which we have reworded: (1) whether Appellant's convictions are factually insufficient, and (2) whether the convening authority impermissibly considered the gender of potential court members when detailing court members to his court-martial. We have carefully considered issue (2). We do not find this issue requires discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). As to issue (1), we find no prejudicial error and affirm.

## I. BACKGROUND

### A. Background

Appellant originally migrated to the United States. He was born in 1986 and raised in Haiti but later moved to the Dominican Republic after an earthquake. Then, in 2013, Appellant moved to the United States to continue his education and work. Eventually in 2017, inspired in part by all the help the United States gave his family as a child in Haiti, Appellant joined the United

---

[1] Unless otherwise stated, all references to the UCMJ and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant was acquitted of three other Article 120, UCMJ, specifications.

States Air Force. While a member of the Air Force, Appellant became a citizen of the United States.

The victim, RY,[3] also immigrated to the United States. She was born and raised in Kenya but came to the United States in 2021 at the age of 23 after winning a "green card" lottery. RY was inspired to join the Air Force a year later in March 2022, in part because she was grateful for all the aid the United States sent her family as she grew up in Kenya.

Several times during her in-court testimony, RY highlighted the differences between her culture in Kenya and the culture of the United States. For example, she noted that she was raised in a village where neighbors were all close and created a friendly community. She also testified,

> In Kenya, anytime you [sic] dating, it's something that your family has to agree with the other family and to know that you guys are dating is never a secret. And the ladies are more preserved [sic]. Anytime you're dating, they would like to see the guy — like to see them during the day. They don't — they don't support like even in like meetings and all that. Unless it's a matter of they trusted the guy and maybe go married so you can go outside anytime you want to, but if maybe you're, like dating, they don't — they don't appreciate you taking the girl anytime you want to.

**B. Pre-Assault Interactions between Appellant and RY**

During the holiday period of 2022, RY was volunteering at the Tyndall Air Force Base shopping exchange by wrapping gifts. It was there she first met Appellant when he was a customer of the gift-wrapping table. RY asked Appellant if he was from Africa given his accent—Appellant shared he was Caribbean. Appellant mentioned he had a colleague from Kenya, so RY gave Appellant her phone number "so [Appellant could] give the number to [the colleague] so [she] can be able to talk to him." During this conversation, RY told Appellant she had no friends or family in the area, had been at the base for four months, and had never been off base.[4]

RY did not have Appellant's telephone number until Appellant texted RY that same night. In their initial text conversation, Appellant asked questions about the gift-wrapping table where RY volunteered. Appellant returned to the gift-wrapping table the next day, where he again saw RY. After the latest

---

[3] At the time of the offense and when she testified at trial, RY was an active-duty enlisted member of the Air Force.

[4] In a conversation soon after, RY told Appellant she did not have a driver's license or know how to drive.

encounter at the gift-wrapping table, Appellant and RY continued to text each other almost daily—from 21 December 2022 until 25 December 2022. The record indicated Appellant and RY exchanged 31 pages of text messages, including several pages of photographs of food. At first the topics of conversation were benign—the two shared Christmas plans, and Appellant mentioned he was going to visit Maryland, a place of which RY had never before heard. Text exchanges continued frequently on topics ranging from food and daily hobbies and eventually to each other's dating history. RY told Appellant she was single and had happily been single for approximately four years.

RY testified at trial that she perceived that at some point Appellant started "flirting" with her over these text messages. Often RY would "switch topics" and "dodge questions in a friendly way." For example, on 22 December 2022, the following exchange occurred:[5]

> [RY:] Okay, have a great day at work, stay out of trouble.
>
> [Appellant:] same to you. Thanks.
>
> [RY:] You very welcome.
>
> [Appellant:] you still at pt?
>
> [RY:] Just done now
>
> [Appellant:] nice, go home take a nice shower. and eat
>
> [RY:] Exactly, am cold, picking breakfast now heading to my room
>
> [Appellant:] u cold… u wanna cuddle?
>
> [Appellant:] lol
>
> [RY:] [laughing crying emojis][cover eyes emojis]
>
> [Appellant:] what?
>
> [RY:] Am noting just mixture of blushing and laughing

Later the same day, when Appellant was driving to his home, the following text exchange occurred:

> [RY:] I don't wanna text you, cause I need you to focus on the road lol.
>
> [Appellant:] Okay
>
> [Appellant:] [heart emoji]

---

[5] Unless otherwise noted, all referenced text messages are copied verbatim from Prosecution Exhibit 2, which was admitted substantively at trial without limitation.

[RY:] [smiley face emoji]

[Appellant:] mmmmmmmmm

[RY:] Thank you for the love imogy [smiley face emoji]

[Appellant:] you re welcome

[RY:] You make me smile,

[RY:] Stil in traffic?

[Appellant:] i do? yes i am

[RY:] Yeap, sorry about that,

[RY:] Don't be too sweet to me, I don't wanna fall in love,

[Appellant:] [big eye emoji]

[Appellant:] it s Ok to fall inlove.

[RY:] Am scared of falling in love,

[Appellant:] why

[RY:] because I don't wanna get hurt, I hate pain remember because people do change

. . . .

[RY:] I just told you don't be too sweet, I don't want you to make me feel like am on cloud 9 then I woke up to realize I was in a world of fantasy, what a pity.

[Appellant:] yeah. i am not sure what to say.

[Appellant:] sorry. [sad face emoji]

[RY:] [laughing crying emojis]

[RY:] You don't have to say anything sometimes lol [smiley face emoji]

[Appellant:] lol

[RY:] Am here, are you upset lol?

[RY:] Did I hurt your feelings? Be honest.

[Appellant:} not at all

[RY:] I wanted to make sure lol, I treasure honesty and friendship, thsys shy I wanted to make sure I did hurt my friend.ssil on traffic?

On 24 December 2022, the following exchange occurred:

5

[Appellant:] I m drinking coffee.lol

[RY:] At least it keeps you warm.

[RY:] Am planning to get up and make breakfast .

[Appellant:] yummy

{RY:} [Laughing crying emojis]

[Appellant:] you ll be my breakfast.if was there [big eye emoji][laughing crying emoji]

[RY:] Oooh my God!how can a human being be a breakfast. You eat people [grimace emoji]

. . . .

[Appellant:] sometimes i do

[RY:] Oooh my God, you scaring me.

[Appellant:] really

[Appellant:] fun

[Appellant:] ny

[RY:] How can I hung out with someone who the next minute is gonna make me his food, that's dangerous , am scared

[RY:] I will start being careful when it comes to you [laughing crying emoji]

[Appellant:] lol

[Appellant:] you might eat me first

[Appellant:] endup

[RY:] Nooo I don't think so

[RY:] I have no feelings they died long a go.

[Appellant:] really?

[Appellant:] what happened?

[RY:] Yeah

[RY:] Been so busy until I forgot about love stuff, and the cells and hormones ended up dying.

[Appellant:] when they come back i might not able to handle them

[RY:] I don't think if they will come back, they are one for good lol.

[Appellant:] what u think I should do?

[RY:] No thank you, I don't think if there is something you can do about it.

[Appellant:] i am sorry

[RY:] Noo you don't have to be sorry lol, it not your fault [smiley face emoji]

[Appellant:] lol

[Appellant:] big talk

You have so long no sexual feeling for man nor woman?

[RY:] Oooh my God [cover eye emoji]

[Appellant:] answer please

[RY:] I don't know what to say.

Appellant and RY then briefly discussed Appellant's prior marriage. RY texted Appellant two times on 26 December 2022, but Appellant did not respond.

## C. The Charged Conduct

### 1. Background

Text conversations between RY and Appellant resumed on 2 January 2023, when Appellant reappeared in the conversation and apologized for leaving his phone in another state. Appellant called RY around 2300 and asked if she wanted to "hang out" that same night. RY noted it was late at night but Appellant assured her they could still spend time together. RY hesitated and asked Appellant what they would be doing together. Appellant said they would be "chilling, watching video games, watching movies." RY asked what time he would drive her back to base, and he mentioned RY could just stay the night at his place. Appellant assured RY he had two bedrooms and two bathrooms and that RY could spend the night in the guest room. After that, RY agreed to have Appellant pick her up from the dormitories. Appellant picked RY up around midnight and took her off base to his house. This was the first time RY had been off the base since she was new to the base and could not drive.

### 2. RY's Testimony

During the car ride, Appellant started to "caress" RY's hair, neck, and shoulders. RY told him to stop, and Appellant relented. When they arrived at Appellant's house, Appellant and RY went to Appellant's living room where RY sat on the edge of the couch and Appellant started playing video games. RY

tried to strike up a conversation with Appellant while he played, but she got curt responses from Appellant. After about ten minutes, RY asked to be shown the guest room so she could just go to sleep and try the conversation again tomorrow. Appellant said to RY, "[A]re you not gonna hug me?" RY responded, "[N]o, I don't know you and I'm uncomfortable with you."[6] After, Appellant took RY upstairs. She started to enter the guest room, but Appellant turned her body to face him and hugged her, which made her more nervous. Appellant "pretended like it was just a friendly grab and he was pretending to be cracking [RY's] back." RY responded that it did not look like he was doing that and asked Appellant to stop because it was making her "nervous."

RY tried again to enter the guest room, but Appellant grabbed her arm and asked her to stay the night in his bedroom with him instead. RY declined. Appellant persisted and started to physically pull RY into his room while RY resisted. Appellant then lifted RY up, carried her into his bedroom, and threw her onto the bed. RY said to Appellant, "[P]lease don't do this," prompting Appellant to respond, "[D]on't you want to play a little bit with me?" RY responded by asking what kind of games are played in bed and telling Appellant, "this is not what [she] was expecting." Appellant told her he was waiting for the right "mood" and RY said to him again that she did not want to be in bed with him and that this was not what she thought "hanging out" meant.

During this discussion, Appellant repeatedly tried to spread open RY's legs and disrobe her, but RY resisted his efforts and continued to tell him, more and more forcefully, "I don't want to do this. This is not hanging out. I don't know how you guys call it in the States, but the way, you know, by hanging out, it doesn't mean this way." Appellant was unsuccessful in removing RY's clothes. After this "battle" Appellant said to RY, "I'm done with you;" RY testified that she took this to mean "you're so trouble- troublematic [sic]." RY then left Appellant's bedroom and went to the guest room.

### a. Specification 4 of the Charge

Appellant followed RY into the guest room, laid on the bed, and told RY, "I want to cuddle with you for this night." RY again told Appellant to stop. Then RY said the following to Appellant:

> [Y]ou got married for a long time for you to get more than enough cuddles. What's new that you don't know about cuddles? . . . I don't want anything to do with cuddles. I don't want you to be on my bed. . . . [T]his was in the agreement. You didn't tell me you were gonna cuddle me. You didn't tell me you gonna be on my

---

[6] RY explained the car ride there made her uncomfortable, but she still believed that Appellant could be trustworthy because he was an Airman.

bed. . . . [W]hat was the reason for you to tell me that you had two bathrooms, two bedrooms, if you were gonna spend night in my bed[?]

Appellant responded to RY's comments by saying "[Y]ou ladies usually pretend like you don't want something, but in real sense, you want it." RY responded to him, "I don't know what kind of ladies are those. I'm totally your friend." RY also told him, "I come from a different place." Even so, Appellant tried to remove RY's clothes. RY continued to tell Appellant that she did not want to do anything with him, and Appellant responded by saying "you know what, shut up" and "you've been too loud. You're talking too much." Appellant tried to silence her by keeping his mouth on her mouth.

Eventually, the much older and physically larger Appellant was able to remove RY's clothes. RY believed Appellant was still trying to get her in the "mood" by licking her neck and ears while she was "battling" and telling him to stop repeatedly. Appellant licked RY's vagina and digitally penetrated her after forcefully spreading her legs apart and holding her in place. RY did not want to be "too much aggressive" because she did not want to hurt Appellant during the "battle," so she did not "bang his head" and hurt him. Appellant also tried to put his penis in her vagina during this encounter but was unable to given RY's resistance.

After successfully prohibiting Appellant from penetrating her vagina, RY tearfully recounted what happened next:

He didn't want to have conversation with me. He was into action. That's what he was doing. And then, he was like, "you know what, anything I'm trying to do to you, you don't want to do it." So you know what, this penis should get somewhere." I was like, "where do you want to get the penis?" He told me, "I'm gonna show you." What he did, he come closer to my chest and then he insert the penis — he did hold my hands — like he did kept his hands on my head like this and he did hold my head so tight like this, and then came closer to my chest and kept his dick and he was thrusting in my mouth.

For about one minute, Appellant continued thrusting his penis in RY's mouth. To stop Appellant, RY acted like she was "throwing up" with a "gagging" sound and then Appellant stopped. RY walked to the bathroom and kept the lights off. Appellant followed her into the bathroom, turned on the lights and when he saw she was not actually throwing up, Appellant called RY a "liar." RY remained in the bathroom to wash her mouth and face and compose herself. RY verbally confronted Appellant again asking why he did this and told him this was not what "hanging out" meant and that this was not their

"agreement." Appellant just stared coldly at RY and silently returned to his room. These facts formed the basis of Specification 4 of the Charge, violation of Article 120, UCMJ, alleging Appellant penetrated RY's mouth with his penis, without her consent.[7]

RY went to the guest room and tried to sleep, although she did not sleep well or fall asleep quickly. RY had her phone with her, but at the time the only local contact she had saved in the phone besides Appellant was her supervisor. RY thought she was "in trouble" and did not want to "involve" her supervisor with her trouble so RY did not call anyone. RY also thought about leaving, but she was worried things could get worse if she did. RY was also concerned that it was dark, and she had never been off base, could not drive, and did not know where she was.

### b. Specification 5 of the Charge

Around 0800 hours the following day, RY knocked on Appellant's bedroom door and nicely asked if he could take her back to base.[8] Appellant told her he wanted to sleep a bit more, so she should "prepare herself" and when she was done, he would take her back to base. RY went to take a shower in the guest bathroom. She returned to the guest room in a towel after her shower, and Appellant unexpectedly entered the guest room. RY was surprised and asked Appellant what he was doing in her room—but Appellant was silent and "didn't look friendly" but "scary." Then Appellant said, "[Y]ou think you are — you are — you gonna leave my house just like that?" RY responded, "[W]hat do you want to do? Like I thought you asked me to go get prepared and you're gonna take me to the base?"

Appellant then pushed RY, clad in only her towel, down onto the bed. RY clutched at the towel trying to keep it on. RY described what happened next:

> He was able to — because he was vigorous like, he was using all his energy, and I was using all my energy. So he was moving my towel after taking it back by. He was too energetic than me. So he was able to take off the towel. So after he took — he took off the towel, I was like trying to run towards the headboard as well.

---

[7] The members acquitted Appellant of both Specifications 2 and 3 of the Charge which alleged Appellant penetrated TY's vulva with his tongue, without her consent, and penetrated TY's vulva with his fingers, with an intent to gratify his sexual desire, without her consent.

[8] RY explained that she was calm and kind in the morning, despite what Appellant had done the night before, because she did not want things to escalate and she hoped her kindness would ensure Appellant took her home safely without further incident.

. . . .

Yes, and still — he was also coming towards me. And then that's when he — now it was like — it was like a serious battle. This person, it's like he was so determined. And remembering that yesterday we had the same battle trying to keep my — trying to spread my legs and to keep my legs together, my pelvic side was tired because it was too much battle. I felt so tired, like I was fighting. That's how I felt it. So in the morning, I was also so tired. Though I tried to bring my legs — he'll kicking my legs — he'll spreading my legs — I was bringing my legs together, but I was [indiscernible] because of the yesterday battling bringing my legs back and forth, back, and forth . . . .

. . . .

. . . I was telling him, "stop." I can't stress enough. . . . I told him, "stop, don't do this." I told him, "I feel like you tricked me — why do you have to tell me that you have some bathrooms? Why did you have to tell me that I have my own place? That means I should trust you." I'm like, "why are you doing this? You're violating the trust that I had towards you." . . . So when he done then — so he was able to insert in to penetrate me. And I couldn't fight back . . . .

RY confirmed that it was Appellant's penis that penetrated her vagina. These facts formed the basis of Specification 5 of the Charge, violation of Article 120, UCMJ, alleging Appellant committed a sexual act upon RY by penetrating her vulva with his penis, without her consent.

### c. The Additional Charge and Specification

RY continued to ask Appellant to stop thrusting his penis into her vagina, but Appellant told RY "he couldn't stop because it was sweet. It was like — it was a good feeling." When Appellant was done, he ejaculated on RY's chest and said, "[I]t was so good." Appellant then lay on the bed next to RY and threw a towel to RY for her to clean off her chest He then went back to his room to sleep while RY wept in the guestroom. These facts formed the basis of the Specification of the Additional Charge, violation of Article 134, UCMJ, alleging Appellant committed indecent conduct by ejaculating on RY's chest without her

consent, and that said conduct was to the prejudice of good order and discipline in the armed forces.[9]

### d. After the Charged Conduct

RY soon went downstairs and waited for Appellant to reappear and take her back to base. Again, RY considered leaving the house, but she did not know where she was. RY messaged with her family back in Kenya during this time but did not tell them what had just happened because she did not want to break that news to them so far away. Around 1500 hours, RY knocked on Appellant's bedroom door and again calmly asked him to take her to base. Appellant originally told her he would take her back at 1800 hours, but then again tried to change the time and say he would take her back the next day. RY insisted she go back sooner. Appellant told RY if she gave him a kiss he would take her back to base. RY relented, kissed Appellant and eventually Appellant took RY back to her dorm room on base.

On the car ride back, RY was silent and Appellant said to her, "[A]nd so now you're not going to talk to me?" RY responded by saying to Appellant, "I never believed you could do something like that after I had trusted you." RY continued, "[Y]ou know what, you'll never hear anything from me. I will never text you. I will never call you. And I'm gonna block your number." Appellant responded by saying, "I'll also definitely do the same. You won't hear from me." The two never spoke again.

RY returned to her dorm room and showered. She again spoke to her family in Kenya but given the time difference she chose not to tell them what had happened. RY then slept until morning. The next morning, on 4 January 2023, RY searched online for words to the effect of "hotline for sexual assault" and called a number which appeared in response to her search—she was then transferred to the military base victim advocate team. On 4 January 2023, RY autonomously started the reporting process of investigative interviews and eventually submitted to a hospital examination and treatment.

During their testimony, both the examining nurse at the hospital and RY's supervisor recounted substantially similar versions of RY's assault and the convicted misconduct as RY had reported to them right after the incident.[10]

---

[9] The members acquitted Appellant of Specification 1 of the Charge which alleged Appellant touched RY's breast with his hand, with an intent to gratify his sexual desire, without her consent.

[10] These post-assault statements made by RY were admitted substantively without objection or limitation at trial.

The nurse who examined RY described RY as "pretty timid and upset" during the exam. During the post-assault examination, the nurse noted one bruise on RY's left breast. The nurse did not recall seeing any scratches or vaginal lacerations or bruising but testified that in her experience of over 125 sexual assault examinations, "it's very common to not have injury with sexual assault." The nurse also recalled that RY showered "more than she could count" after the assault and prior to her exam, which could impact DNA results as "[t]he amount of time and the amount of showers washes away DNA."

RY chose to file an unrestricted report of sexual assault against Appellant, cooperated with the Office of Special Investigations (OSI), and soon told her supervisor what had happened. RY's supervisor testified to the court members about RY's description of the assault in the days following the assault. RY's supervisor immediately noticed a change in RY's demeanor after she began to talk about the night with Appellant. He also observed that RY had lost her normal "bubbly" personality—instead RY seemed "depressed" and as if "sadness, like overwhelmed her." RY's supervisor testified to the emotional breakdown RY had while recounting the incident. RY's testimony at trial was also often interrupted by emotion while recounting the events of the night at Appellant's house.

During its investigation, OSI went to Appellant's home and collected a bed comforter, bedding sheets, pillowcases, a towel from the guest bedroom, and a SAFE kit, which were all sent off for lab testing. The SAFE kit contained some DNA swabs taken from various locations on RY's body and the towel was tested for both RY and Appellant's DNA. A laboratory expert testified with a high degree of certainty that Appellant's DNA was found on RY's body and that RY's skin cells and Appellant's semen cells were found on a stained hand towel from Appellant's guest room.

### 3. Appellant's Testimony

Appellant testified in his own defense at trial. Appellant's recall of the events leading up to the night in question were substantially similar to RY's, including how they met at the gift-wrapping table and exchanged text messages in the days to follow.

Appellant testified that it was RY who had the idea to come over to his off-base house the night in question and stated he thought the plan was to "cook food" at his place. Appellant denied touching RY in the car while driving to his place, except to say "hi" and greet RY. Appellant testified that when they arrived at his house off base, he and RY sat on the couch in the living room and played video games. Soon after they arrived at his place, Appellant testified he was tired and wanted to go to bed, so he took RY upstairs to show her the guest room. Appellant mentioned he wanted to shower first, and that RY said to him,

"[D]o you want me to take a shower with you?" Appellant told RY that was not "appropriate." Appellant said he showered and came out to RY waiting for him in the hallway in her pajamas. Appellant recounted that RY said she had been "working out a lot" and asked Appellant to "crack her back." Appellant hesitated because he was worried about "being close to [her] body like that," but RY said it was "fine," so he did crack her back.

Appellant testified that shortly after cracking RY's back he was trying to go to bed, but RY was "disappointed" because she came to "hang out" so they kept chatting in the hallway. Appellant stated that at this point the conversation was "almost like purely sexual" and then he and RY went to the guest room. Appellant said they were "kissing, [they] end [sic] up being in bed together and [they] did have sex." Appellant testified to some foreplay between the two, where RY removed both her own and Appellant's clothes. During the sex he said occurred that night, Appellant described himself in the plank position[11] above RY, and that RY was doing "upside down movement with [his] penis" where "[RY] ha[d] her hand and moving [his] penis up, down with her, in[to] her vagina." Appellant said after five to ten minutes his body hurt and he asked RY to stop. She did, and Appellant went to his bed. RY followed him to his bed, and they slept together in Appellant's bed.

Appellant said he awoke around 1300 hours, went to get food, and heard RY showering. Appellant then invited her to eat food and watched her talk to her family while he played video games. He said the two stayed downstairs and ate, and at some point, Appellant's ex-girlfriend called his phone, revealing a heart emoji on the screen. Appellant said RY saw the incoming phone call and contact photograph and notified Appellant he had a call. Appellant perceived that RY seemed to "change" after that missed call and that RY asked to go home and seemed "mad." When Appellant dropped RY off at the dorm, he recalled she said, "[H]ey, please don't call me or text me anymore."

### 4. Other Facts

At trial, Appellant's defense counsel cross-examined RY on the versions of events that would later become Appellant's testimony. In fact, RY's cross-examination consisted almost entirely of asking RY leading questions about Appellant's version of the events. Where RY's and Appellant's versions of the evening diverged, RY unequivocally denied Appellant's version of the events on the night in question.

---

[11] During re-direct, trial defense counsel elicited testimony that Appellant had difficulty communicating sometimes, and that by "plank" Appellant meant he was in a "downward facing position on [his] knees and hands."

During Appellant's cross-examination, Appellant admitted he found RY physically attractive. Appellant admitted that "multiple times" during their text message exchanges, RY and he had "sexual conversations," and although he did not concede he initiated them he did not dispute the authenticity of the texts that were admitted at trial or discussed above. Where RY's and Appellant's versions of the evening diverged, Appellant generally denied RY's version of the night in question. Trial counsel asked Appellant about his version of the alleged sexual act, culminating with the following question: "[S]o despite only ever planking for 1 or 2 minutes, in a situation where you were incredibly tired, had been up for over 24 hours, and we're not very interested in what was happening with [RY], you were able to plank for 5 to 10 minutes?" Appellant agreed "yes" that is what happened. Trial counsel also asked, "So you're aroused, you're on top of her, and she's willing to have sex with you, and you're just planking?" Appellant agreed with that assertion by responding, "Yes." Appellant alleged he did recall ejaculating during this sexual encounter.

In response to a member's question that inquired if "at any point, did you or [RY] ask for consent," Appellant responded:

> Because the way that we started our conversation, we did not. It's like, "hey, are you going to have that or am I going to have that." The conversation and touching and being close to each other — that while we're talking, no. But we — we never have a "no," while we doing it. Like say, "hey, I'm not doing that," or "hey, I'm not — I'm going to do that." No, there is no — any like fight or something, sir.

After Appellant's testimony, trial counsel called a witness who testified that Appellant told him about the upcoming court-martial, and that the reason he was being court-martialed was because Appellant "ended things" with RY and that RY then made up false accusations against him because he ended things with her.

## II. DISCUSSION

### A. Law

#### 1. Factual Sufficiency

We review questions of factual sufficiency only if (1) an appellant requests factual sufficiency review and (2) an appellant shows a specific deficiency in proof. *United States v. Harvey*, 85 M.J. 127, 129 (C.A.A.F. 2024) (citing Article 66(d)(1)(B)(i), UCMJ, 10 U.S.C. § 866(d)(1)(B)(i), *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*)). The current version of Article 66(d)(1), UCMJ, states:

(B) FACTUAL SUFFICIENCY REVIEW. –

> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon a request of the accused if the accused makes a specific showing of a deficiency of proof.

> (ii) After an accused has made such a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—

>> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and

>> (II) appropriate deference to findings of fact entered into the record by the military judge.

> (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B) (2024 *MCM*). This factual sufficiency standard applies to courts-martial in which every finding of guilty in the entry of judgment is for an offense occurring on or after 1 January 2021. *See* National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 542(e)(2), 134 Stat. 3388, 3612–13 (2021).

"[T]he requirement of 'appropriate deference' when a [Court of Criminal Appeals] 'weigh[s] the evidence and determine[s] controverted questions of fact' . . . depend[s] on the nature of the evidence at issue." *Harvey*, 85 M.J. at 130 (second and third alterations in original). It is within this court's discretion to determine what level of deference is appropriate. *Id.*

"[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id.* at 131 (internal quotation marks omitted).

For this court "to be 'clearly convinced that the finding[s] of guilty [were] against the weight of the evidence,' two requirements must be met." *Id.* at 132. First, we must decide that evidence, as we weighed it, "does not prove that the appellant is guilty beyond a reasonable doubt." *Id.* Second, we "must be clearly convinced of the correctness of this decision." *Id.*

**2. Elements**

In order to convict Appellant for sexual assault, as alleged in Specification 4 of the Charge, the Government was required to prove: (1) that Appellant

committed a sexual act upon RY by penetrating RY's mouth with Appellant's penis; and (2) that Appellant did so without RY's consent. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(2)(d).

In order to convict Appellant for sexual assault, as alleged in Specification 5 of the Charge, the Government was required to prove (1) that Appellant committed a sexual act upon RY by penetrating RY's vulva with Appellant's penis; and (2) that Appellant did so without RY's consent. *See MCM*, pt. IV, ¶ 60.b.(2)(d).

"Sexual act" is defined, as relevant here, as "the penetration, however slight, of the penis into the vulva or anus or mouth." *MCM*, pt. IV, ¶ 60.a.(g)(1)(A).

In order to convict Appellant for indecent conduct, as alleged in the Specification of the Additional Charge, the Government was required to prove (1) that Appellant engaged in certain conduct, to wit: ejaculated on RY's chest without her consent; (2) that the conduct was indecent; and (3) that under the circumstances, the conduct of Appellant was to the prejudice of good order and discipline in the armed forces. *See MCM*, pt. IV, ¶ 104.b.

"Indecent" is defined as "that form of immorality relating to sexual impurity, which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations." *MCM*, pt. IV, ¶ 104.c.(1). "This provision is not intended to regulate wholly private consensual sexual activity. In the absence of an aggravating circumstance, private consensual sexual activity . . . is not punishable as indecent conduct." M*ilitary Judges' Benchbook*, Dept. of the Army Pamphlet 27-9 at 1634 (29 Feb. 2020) (*Benchbook*).

Conduct "prejudicial to good order and discipline" is conduct which causes a reasonably direct and obvious injury to good order and discipline. *Benchbook*, at 812 and 1633.

Relevant to all specifications of which Appellant was convicted, consent is defined as "a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A). "Submission resulting from the use of force, threat of force, or placing another person in fear also does not constitute consent." *Id*. "A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue does not constitute consent." *Id*. "All the surrounding circumstances are to be considered in determining whether a person gave consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(C).

### 3. Defense of Mistake of Fact as to Consent

The military judge determined mistake of fact as to consent was a possible defense to all specifications of which Appellant was convicted.

"[I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense." Rule for Courts-Martial (R.C.M.) 916(j)(1). If the mistake goes to an element requiring general intent, it "must have existed in the mind of the accused and must have been reasonable under all the circumstances." *Id.* Therefore, an honest and reasonable mistake that the victim consented to the charged sexual contact is an affirmative defense to the charged offense. *See, e.g.*, *United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019) (considering the defense of mistake of fact to a charge of sexual assault). Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1); *McDonald*, 78 M.J. at 379.

In considering whether the defense of mistake of fact as to consent was raised at trial, we "consider the totality of the circumstances at the time of the offense" and consider "whether the record contains some evidence of an honest and reasonable mistake to which the [factfinder] could have attached credit if they had so desired." *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F. 2003) (citations omitted). While the quantity of evidence required is low, the record must contain evidence supporting both the subjective "honest" and the objective "reasonable" mistaken belief. *See United States v. Davis*, 76 M.J. 224, 230 (C.A.A.F. 2017) (citation omitted) ("[W]hile [the a]ppellant's statement may constitute a scintilla of evidence about his 'honest belief,' . . . there is not an iota of evidence that such a belief was reasonable."); *see also United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995) (citation omitted) ("The testimony relied on by appellant tended to show objective circumstances upon which a reasonable person might rely to infer consent. However, they provided no insight as to whether appellant actually or subjectively did infer consent based on these circumstances.").

When determining what is reasonable, we know that "'[d]ue care' is 'such care as would be exercised by an ordinarily prudent [person] when sober.'" *United States v. Harrington*, No. ACM 39825, 2021 CCA LEXIS 524, at *17 (A.F. Ct. Crim. App. 14 Oct. 2021) (unpub. op.) (second alteration in original) (quoting *United States v. Bragg*, 4 C.M.R. 778, 782 (A.F.C.M.R. 1952); and then citing RESTATEMENT (SECOND) OF TORTS § 283C cmt. d (AM. LAW INST. 1965) (explaining that if a drunken person's "conduct is not that of a reasonable man who is sober, his voluntary intoxication does not excuse" conduct that would otherwise be negligent)), *rev'd on other grounds*, 83 M.J. 408 (C.A.A.F. 2023); *see also United States v. Moore,* No. ACM S32477, 2018 CCA LEXIS 560, at *12 (A.F. Ct. Crim App. 11 Dec. 2018) (unpub. op.) (citation omitted) ("This

defense has two elements: one subjective and one objective. For the subjective element, ignorance or mistake must have existed in [the a]ppellant's mind. For the objective test, the ignorance or mistake must be reasonable under all the circumstances as assessed by an ordinary, prudent, sober adult.").

The concept of "reasonably prudent person" is an objective standard. *Harrington*, unpub. op. at \*17. "The actor is required to do what this ideal individual would do in his place. The reasonable man is a fictitious person, who is never negligent, and whose conduct is always up to standard." *Id.* at \*17–18 (citing RESTATEMENT (SECOND) OF TORTS § 283 cmt. c (AM. LAW INST. 1965)); s*ee also Benchbook*, at 1425 ("A reasonable belief is one that an ordinary, prudent, sober adult would have under the circumstances."). "Voluntary intoxication does not permit what would be an unreasonable belief in the mind of a sober person to be considered reasonable because the person is intoxicated." *Benchbook*, at 1425–26.

In *United States v. Greaves*, 40 M.J. 432, 437 n.5 (C.M.A. 1994), our superior court stated,

> It would seem that one is not being reasonable if one is being reckless or negligent. Thus it would seem that for one reasonably to believe something, one must have taken such measures as to not be reckless or negligent with respect to the truth of the matter. In other words, one must be seen as exercising due care with respect to the truth of the matter in issue.

"If a mistake is honest yet 'patently unreasonable,' the defense is unavailable to an appellant." *United States v. Rodela*, 82 M.J. 521, 526 (A.F. Ct. Crim. App. 2021) (quoting *Davis*, 76 M.J. at 230).

### 4. Evidence

"Testimony 'need not be completely consistent to still be sufficiently reliable to sustain a conviction, and we do not confine our analysis to merely the testimony of a single witness in performing our factual sufficiency review under Article 66, UCMJ.'" *United States v. Gere*, No. ACM 39697, 2020 CCA LEXIS 429, at \*25 (A.F. Ct. Crim. App. 24 Nov. 2020) (unpub. op.) (quoting *United States v. McFadden*, No. ACM 38597, 2015 CCA LEXIS 520, at \*11 (A.F. Ct. Crim. App. 18 Nov. 2015) (unpub. op.) (additional citation omitted).

Sexual assault cases often turn on the fact finder making a witness credibility determination because of conflicting testimony between the victim and the accused. "'[H]owever, the mere fact that appellant testifies to a different or exculpatory version of the incident does not necessarily mean that there is a 'fair and rational hypothesis other than guilt.'" *United States v. Hale*, ARMY 20190614, 2021 CCA LEXIS 245 at \*13 (A. Ct. Crim. App. 19 May 2021)

(quoting *United States v. Ross*, ARMY 20190537, 2020 CCA LEXIS 353, at *12 (A. Ct. Crim. App. 30 Sep. 2020) (mem. op.)).

## B. Analysis

At trial and on appeal, Appellant does not dispute that some sexual act occurred between him and RY, but he does dispute the nature and extent of their sexual encounter. Appellant argues his convictions are factually insufficient due to (1) "the contradictions of, and inconsistent statements made by [RY]," (2) RY's "motive to misrepresent," (3) RY "fe[eling] used, betrayed, and led on for weeks" by Appellant, and (4) "the findings in the SANE[12] report" which do not indicate evidence of trauma. The Government argues, *inter alia*, that "RY was forthcoming and admitted to the inconsistency" and "RY's honesty about the inconsistency made her more credible, not less."

Appellant has made a request for a factual sufficiency review. We assume without deciding that Appellant properly made a request for a factual sufficiency review by asserting a specific showing of a deficiency of proof as required under Article 66(d)(1)(B)(i), UCMJ (2024 *MCM*). However, having given appropriate deference to the fact that the members saw and heard the witnesses and other evidence, we are not clearly convinced that Appellant's convictions are against the weight of the evidence. Thus, we conclude the findings are factually sufficient.

Since RY and Appellant both testified at trial to different events on the night in question, the trier of fact necessarily had to weigh the credibility of both Appellant and RY prior to entering findings. After giving appropriate deference to the findings of the members at trial who saw and heard the witnesses, in our own review of the evidence we are convinced of Appellant's guilt beyond a reasonable doubt. RY's testimony, coupled with other corroborating evidence, proved every element of the Government's case beyond a reasonable doubt despite Appellant's contradictory testimony.

RY was a sympathetic and compelling witness. RY was young at the time of the assault and trial, a fact compounded by the reality that Appellant was nearly twice her age. RY was naive, vulnerable, and inexperienced in ways that made her version of the events in question much more credible. For example, Appellant had been in the United States for nearly a decade prior to meeting RY and was much more familiar with American "culture" than RY. The text

---

[12] Our review of the record indicates SANE stands for Sexual Assault Nurse Examiner. We also note that while the actual SANE report was not entered into evidence at trial, there was some relevant testimony adduced by the examining nurse related to injuries, or lack thereof, during the exam. As always, we limited our factual sufficiency review to the evidence presented on the merits to the members.

messages admitted at trial, like those which discussed Appellant "eating" RY for dinner, highlight the differences between the two in both their vernacular and cultural understanding as well as how Appellant made RY uncomfortable and RY tried to avoid potentially sexual discussions with Appellant.

The admitted text exchanges like the one discussed above set the scene for analogous details contained in RY's account of the event in question. These texts also documented RY's naivety, a key aspect to understating her testimony. RY's recall of details like "what kind of game do we play on a bed" and "this is not what hanging out" means are believable when the entirety of their communication is considered. This bolsters the remaining testimony related to the charged conduct, describing the sexual act and the expression of non-consent before and during each act. In court, RY's diminutive tone of voice and repeated expressions of emotion at trial, weighed in favor of her credibility.

Beyond that, RY's testimony was corroborated by several other facts. RY's supervisor corroborated the fact that RY was very new to the base and had no friends and could not drive at the time of the assault. Both RY's supervisor and the examining nurse recounted RY's version of events during her out-cry statements to them. The DNA results, both on her body and the towel, also corroborated RY's version of events. While the SANE report did not indicate evidence of injury, this does not make RY's account inconsistent, rather it is explainable by the fact that most sexual assaults do not result in visible physical injury. RY also reported the assault close in time to it occurring and without motive for personal gain at work or otherwise. Additionally, RY had a consistent and compelling demeanor throughout these multiple reports and trial testimony—a visceral and emotional response to the assault. Such facts support RY's credibility and undermine Appellant's suggestion that she fabricated her allegation of the assault.

Regarding RY's credibility, apart from Appellant's own testimony, the evidence at trial fails to suggest RY had any motive to fabricate the allegations—she denied even seeing the phone call Appellant says created the motive in the first place. Even if she did see the phone call, there is no other evidence to suggest RY would be jealous of Appellant receiving that call or "leading her on." RY knew Appellant less than one month before the assault, repeatedly referred to him as a "friend," and indicated she was not interested in romance with Appellant or otherwise. Further, the text messages admitted at trial show Appellant had previously stopped talking to her for days in December with no explanation. During that period RY did not show any indication she was jealous of or angry at Appellant for ceasing communication with her, and nothing in the evidence suggests a missed phone call would have changed RY's lack of feelings regarding Appellant to the point of falsifying allegations against him.

As we have said before, there can be "simple misunderstandings that result in inconsistencies among many witnesses as a result of the witness's memory and perceptions of the events. These inconsistencies do not necessarily make witness testimony less credible." *Gere*, unpub. op. at *24–25. We have considered the discrepancies in versions of events noted by Appellant, along with the alleged motive advanced by Appellant, and are not persuaded they shift the greater weight of the evidence. *Id.*

The Prosecution's evidence at trial was straightforward, logical, consistent, and persuasive. However, unlike RY's reasonable account of the events, Appellant's testimony was unreasonable under the circumstances as it was riddled with inconsistencies, vague, lacking detail, and at times patently unreasonable. We further note Appellant's inherent bias in testifying the way he did.

Appellant's self-serving version of the sexual encounter fails to hold water. Appellant's age and life experiences, including many more years in the United States and as someone who was previously married cut against his unbelievable account of planking over an attractive, naked, single woman in his house who wanted sexual relations with him at midnight and, by his account, was doing everything she could to have sex with him. Even assuming fatigue was a factor in his account, it is simply implausible that Appellant would be a rigid non-participant in the sexual act as he described under the circumstances.

Appellant also did much to hurt his own credibility. Rather than his account being corroborated by evidence, Appellant's account was contradicted by his own statement to a friend about why RY reported the assault. At trial, Appellant highlighted the fact that he thought RY saw his ex-girlfriend's call, became jealous, and was so angry about being led on and rejected that she falsely reported that Appellant sexually assaulted her. However, Appellant told his friend that RY falsified the assault because Appellant broke up with her. While we are not convinced that either of these scenarios, if true, would compel RY to falsely report a sexual assault against Appellant, the mere fact that Appellant did not keep his own story straight undercuts his credibility. Also, there are numerous indications that, in the weeks preceding the sexual assault, RY rebuffed Appellant's repeated efforts to sexualize the conversation or relationship, which directly contradicts Appellant's assertion that RY was the initiator and perpetuator of any sexual acts between the two.

Appellant also made several key damaging admissions and concessions under cross-examination. He admitted that he found RY attractive but still stated he rebuffed her advances. Appellant also did not specifically recall ejaculating during his version of the sexual act even though RY stated that he ejaculated on her chest. As such, Appellant's story does not account for the guest room towel. The lab report indicated there was a single towel stain containing both Appellant's semen and RY's DNA, which corroborates RY's version of events

22

and cuts against Appellant's testimony he did not ejaculate. While it is understandable that Appellant's semen would be found in his home and on his towels at any given time and any given place, the testimony of the expert undercuts any random inference his semen would appear in the same place as RY's DNA on the towel in the guest room.

We also considered the defense of mistake of fact as to consent for each offense and conclude that Appellant did not hold an honest or reasonable mistake as to RY's consent to any of the conduct of which he was convicted. Even if one were to find the defense raised, the Government disproved this defense beyond a reasonable doubt for all specifications of which Appellant was convicted. We note that when a court member asked Appellant if consent was asked for and given that night, he gave a long-winded and nonsensical answer to this important, and simple, question.

In conclusion, while the testimony of the victim and the Appellant differed significantly in this case, and after giving the members appropriate deference, we agree with the members' implicit conclusion that RY was more credible and there was proof beyond a reasonable doubt as to Appellant's guilt. *See, e.g.*, *Hale*, unpub. op at \*14.

### III. CONCLUSION

The findings as entered are correct in law and fact. Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1) (2024 *MCM*). In addition, the sentence as entered is correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court